1
2
3
4
5
6
7
8
9

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RICHARD TRUJILLO, individually, and on behalf of other members of the general public similarly situated, and as an aggrieved employee pursuant to the Private Attorneys General Act (PAGA), <br><br> Plaintiff, <br><br> v. <br><br> THE CHEF'S WAREHOUSE WEST COAST LLC et al., <br><br> Defendants. | Case No. 2:19-cv-08370 DSF (MAAx) <br><br> **ORDER GRANTING PLAINTIFF'S MOTION TO COMPEL (ECF NO. 44)** <br><br> <u>Telephonic Hearing</u>: <br> Date:  November 20, 2020 <br> Time:  10:00 a.m. <br> Judge:  Maria A. Audero |

## I.    INTRODUCTION

Before the Court is Plaintiff Richard Trujillo's ("Plaintiff") and Defendant The Chefs' Warehouse West Coast LLC's ("Defendant") (collectively, the "Parties") Joint Stipulation Regarding Discovery Dispute as to Plaintiff's Motion to Compel ("Motion").  (Mot., ECF No. 44.)  The Motion is based on the following documents:  Plaintiff's Notice of Motion to Compel (ECF No. 43); as Exhibit A, excerpts from the February 10, 2020 videotaped deposition of Richard Trujillo

("Trujillo Deposition") (Trujillo Dep., ECF No. 44-1); as Exhibit B, the Declaration of Bryce Tuttle ("Tuttle Declaration") (Tuttle Decl., ECF No. 44-2); as Exhibit C, the Declaration of Raymond Pinkston ("Pinkston Declaration") (Pinkston Decl., ECF No. 44-3); as Exhibit D, the "Order Regarding Jury Trial" issued by the Honorable Dale S. Fischer, the District Judge presiding over this case (ECF No. 44-4); and, as Exhibit E, the Declaration of Rodney Aguirre ("Aguirre Declaration") (Aguirre Decl., ECF No. 44-5).

Through the Motion, Plaintiff seeks an order compelling further responses to his Interrogatory No. 1 (seeking class contact information), and his Requests for Production of Documents Nos. 5, 6, and 30 (seeking, respectively, timekeeping data, payroll data, and wage statements). (*See generally* Mot.) Necessarily implicated in this discovery is the question of whether Plaintiff is entitled to discovery in the first instance before a class is certified, and if so, the scope of that discovery.

Having read and considered the papers presented by the Parties, and having considered the multiple hours of informal discovery conferences regarding the issues raised in this Motion, the Court finds the Motion suitable for disposition without a hearing. *See* Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15. Accordingly, the hearing set for November 20, 2020 at 10:00 a.m. is hereby **VACATED**.

For the reasons set forth below, the Court **GRANTS** Plaintiff's Motion in its entirety.

## II.    RELEVANT BACKGROUND

### A.    The Claims and Defenses

Defendant is a specialty food distributor engaged in the business of delivering ingredients to restaurants and other food preparation vendors in twenty-six states, including California. (Compl. ¶ 22, ECF 1-1.) In California, it operates two warehouse/distribution centers—one in Union City and one in the City of

Industry.  (Mot. 7.)[1]  Plaintiff worked for Defendant in the position of Warehouse Worker during its day shift, exclusively in Defendant's City of Industry location, from March 2016 to July 2018.  (*Id.*; Compl. ¶ 5.)

On July 22, 2019, Plaintiff filed the instant hybrid class action pursuant to California Code of Civil Procedure section 382, *et seq.*, and representative action pursuant to the California Private Attorneys General Act, California Labor Code section 2698, *et seq.*, ("PAGA"), in Los Angeles County Superior Court.[2]  (Mot. 7; *see generally* Compl.)  Pursuant to his class action allegations, Plaintiff seeks to represent a putative class of all non-exempt hourly employees who worked for Defendant in California (excluding Drivers and Driver Trainers) from July 22, 2015 to the present.  (Mot. 7; Compl. ¶ 53.)  Pursuant to his PAGA allegations, Plaintiff brings representative claims on behalf of the State of California and all other aggrieved employees who worked as non-exempt hourly employees for Defendant in California (excluding Drivers and Driver Trainers) from May 13, 2018 to the present.  (Mot. 7, 8 n.3; Compl. ¶¶ 43, 50.)

On behalf of himself and those persons he seeks to represent, Plaintiff alleges that Defendant violated California wage-and-hour laws by failing to:  pay them overtime premiums, minimum wage, and vacation wages; provide compliant meal periods and rest breaks and pay premium wages for the non-compliant meal periods and rest breaks; provide compliant wage statements; maintain payroll records; pay termination wages; and reimburse business expenses.  (*See generally* Compl.)  Based on these allegations, Plaintiff claims that Defendant engaged in unfair

---

[1] Pinpoint citations of page numbers in docketed documents refer to the page numbers in the ECF-generated headers.

[2] Plaintiff names a number of other defendant entities that are not the subject of this Motion.  (*See generally* Compl.)  Thus, for purposes of this Motion, the Court's reference to "Defendant" shall refer only to Defendant The Chef's Warehouse West Coast LLC.

business practices in violation of California Business & Professions Code sections 17200, *et seq.*  (*Id.*)

Defendant filed an Answer to the Complaint on September 26, 2020, while the case was still in state court.  (Answer, ECF No. 1-2.)  There, it denied, generally and specifically, Plaintiff's allegations.  (*Id.* at ¶ 1.)  In addition, Defendant asserted a number of affirmative defenses, including that Plaintiff and/or the employees he seeks to represent have waived or released their claims against Defendant (*id.* at ¶ 29) and their right to proceed on a class or collective basis (*id.* at ¶ 33).

The case was removed to federal court on September 27, 2019.  (Mot. 7; ECF No. 1.)

### B.    Discovery

At issue here is written discovery propounded by Plaintiff to Defendant— specifically, Plaintiff's Interrogatory No. 1 ("Interrogatory No. 1") and Plaintiff's Requests for Production of Documents Nos. 5, 6, and 30 (each, respectively, "Request No. 5," "Request No. 6," and "Request No. 30").  (Mot. 20, 23–26.)

Interrogatory No. 1 seeks the names and contact information for the putative class members.  (*Id.* at 20.)  In addition, Plaintiff seeks the payroll data (Request No. 5), timekeeping data (Request No. 6), and wage statements (Request No. 30) for a representative sample of the putative class members.  (*Id.* at 9, 23–26.) Plaintiff's class definition has evolved over time.  While first alleged broadly as all non-exempt hourly employees of Defendant in both of its California locations (excluding Drivers and Driver Trainers), Plaintiff has altered the class definition, at least for purposes of this Motion, to all of Defendant's Warehouse Workers in both day and night shifts (respectively, "Day Warehouse Workers" and "Night Warehouse Workers"), at both of its California locations (excluding Drivers and Driver Trainers).  (*Compare* Compl. ¶ 53 *with* Mot. 6.)

///

4

Defendant objects to this discovery on multiple grounds. (Mot. 20, 24–26.) Defendant first contends that Plaintiff is not entitled to pre-certification discovery in the first instance. (Mot. 29–30.) Defendant next contends that, to the extent such discovery is permitted, the scope of discovery should be limited to encompass only those employees who work or worked as Day Warehouse Workers in Defendant's City of Industry facility (excluding Drivers and Driver Trainers) and, from that group, should exclude those who signed an agreement releasing Defendant from the claims alleged here and/or an arbitration agreement through which they waived their right to proceed against Defendant on a class or collective basis. (Mot. 30–40.) Finally, Defendant contends that Plaintiff is not entitled to class contact information or the timekeeping data, payroll data, and wage statements he seeks; but, to the extent the Court grants such discovery, it should be limited to a 10% representative sample of the putative class. (Mot. 40–44.)

### C.     The Parties' Efforts to Resolve this Dispute Without Court Intervention

As the Parties note, the Court is aware that, before filing this Motion, they engaged in extensive meet-and-confer efforts to attempt to resolve their discovery disputes both with and without Court intervention. (*See* Mot. 8.) Indeed, they appeared before the Court on multiple occasions seeking the Court's assistance, all of which were preceded and followed by laudable and productive efforts to narrow their differences. After the informal discovery conference of August 19, 2020 which lasted in excess of three hours ("IDC"), at which the Court granted the Parties' joint request to file a motion regarding unresolved issues, the Parties continued meeting and conferring and resolved the great majority of the disputed issues (Mot. 1 n.1), leaving unresolved only the single interrogatory and three document requests at issue here, premised upon this Court's determination of the proper scope of that discovery.

**III.   DISCUSSION**

    **A.   The Court Grants Plaintiff's Request for Pre-Certification Discovery.**

    Plaintiff seeks discovery at this pre-certification stage of the proceedings in order to support his eventual "move for class certification and [to] assist [him] in properly defining a class and any potential subclasses." (Mot. 5.)  Defendant opposes this request on the ground that Plaintiff has not met his burden to obtain pre-certification discovery.  (*Id*. at 29–30.)

    Defendant's position is in contrast to the position it asserted in the Parties' December 11, 2019 Joint Rule 26(f) Report.  While Plaintiff stated that, for pre-certification discovery, he would seek "the names and contact information of putative class members . . . a sample of payroll records, a sample of time records (whether set forth in a computerized timekeeping system, manually-kept records, or otherwise), and a sample of wage statements," Defendant stated:  "Discovery should proceed in phases, with class certification discovery proceeding first, and merits discovery, if any, second." (ECF No. 14, at 9–10.)  Moreover, Defendant already has engaged in significant pre-certification discovery, having already produced documents and reached agreements with Plaintiff to produce an abundance of such discovery.  (Mot. 5 n.1.)  Nevertheless, the Court will disregard these contradictions and will consider Defendant's arguments and objections to pre-certification discovery as set forth in the Motion and as articulated during the IDC.

    For the reasons set forth below, the Court **GRANTS** Plaintiff's request for pre-certification discovery subject to Plaintiff meeting the other legal burdens associated with discovery as to each of his specific requests, also discussed below.

       1.   <u>Legal Standard</u>

    Federal Rule of Civil Procedure 23(c)(1) provides that "[a]t an early practicable time after a person sues or is sued as a class representative, the court

must determine by order whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A).  To maintain a class action, the plaintiff must satisfy the requirements of Rule[3] 23(a), which provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

In *Kamm v. California City Development Co.*, 509 F.2d 205 (9th Cir. 1975), the Ninth Circuit recognized that "[w]hether or not discovery will be permitted in a case of this nature lies within the sound discretion of the trial court." *Id*. at 209. "In determining whether to grant discovery the court must consider its need, the time required, and the probability of discovery resolving any factual issue necessary for the determination." *Id.* at 210.  The Ninth Circuit recognized that "the propriety of a class action "cannot be determined in some cases without discovery, as for example, where discovery is necessary to determine the existence of a class or set of subclasses." *Id.* at 210.  Although it would be an abuse of discretion to deny discovery in such a case, "[w]here the necessary factual issues may be resolved without discovery, it is not required." *Id.*  Two years later, in *Doninger v. Pacific Northwest Bell, Inc.*, 564 F.2d 1304 (9th Cir. 1977), the Ninth Circuit explained that "the better and more advisable practice" is to permit enough discovery to establish whether a class action is maintainable, "especially when the information is within the sole possession of the defendant." *Id.* at 1313.  Still, the Ninth Circuit

---

[3] Unless otherwise specified, this and all further references to "Rule" shall be to the Federal Rules of Civil Procedure.

noted that, to obtain that discovery, the plaintiff first must either "make . . . a prima facie showing of Rule 23's prerequisites" or "demonstrate that discovery measures are likely to produce persuasive information substantiating the class action allegations." *Id*. Consistent with *Doninger*, the Ninth Circuit later confirmed that "[a]lthough in some cases a district court should allow discovery to aid the determination of whether a class action is maintainable, the plaintiff bears the burden of advancing a prima facie showing that the class action requirements of Fed. R. Civ. P. 23 are satisfied or that discovery is likely to produce substantiation of the class allegations." *Mantolete v. Bolger*, 767 F.2d 1416, 1424 (9th Cir. 1985). "Absent such a showing, a trial court's refusal to allow class discovery is not an abuse of discretion." *Id*. Upon a review of its earlier cases in *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935 (9th Cir. 2009), the Ninth Circuit concluded that the cases "stand for the unremarkable proposition that often the pleadings alone will not resolve the question of class certification and some discovery will be warranted." *Id.* at 942.

Courts in this Circuit applying the teachings of *Doninger*, *Mantolete*, and *Vinole* have concluded that the prima facie showing, to the extent required, need not be "strict." *See, e.g., Kaminske v. JP Morgan Chase Bank, N.A.*, No. SACV 09-00918 JVS (RNBx), 2010 U.S. Dist. LEXIS 141514, at *5–6 (C.D. Cal. May 21, 2010) (holding that "a prima facie showing that was more akin to a showing of likelihood of success at the class certification stage" was "too strict" and "contrary to law"); *Coleman v. Jenny Craig, Inc.*, No. 11-cv-1301-MMA (DHB), 2013 U.S. Dist. LEXIS 82815, at *22 (S.D. Cal. June 12, 2013) (declining to require, as an impermissible burden, that the plaintiff prove a likelihood of success at the class certification stage in order to obtain pre-certification discovery); *Goundar v. Redfin Corp.*, No. CV 13-3698 PSG (MRWx), 2014 U.S. Dist. LEXIS 189393, at *4 (C.D. Cal. July 21, 2014) (allowing pre-certification discovery on "a meager showing" ///

8

and "no evidence in support of [the plaintiff's] contention that Rule 23 certification [would] be appropriate at a later stage of the action").

### 2.   Discussion

Plaintiff cites multiple district court cases in which the plaintiffs requesting pre-certification discovery were not required to make a prima facie showing.  (Mot. 10.)  While it is correct that neither *Doninger* nor *Mantolete* require a prima facie showing in all cases, and that some courts grant pre-certification discovery without it, there is no question that the decision to require such a showing lies soundly within the discretion of the trial court.  *Kamm,* 509 F.2d at 209; *Artis v. Deere & Co.*, 276 F.R.D. 348, 351 (N.D. Cal. 2011) ("Prior to class certification under Rule 23, discovery lies entirely within the discretion of the Court." (citing *Vinole*, 571 F.3d at 942)).

Here, as Defendant aptly points out (Mot. 29), Plaintiff fails to make a prima facie showing in the Motion that a class action is maintainable under Rule 23.  Indeed, the Court notes that Plaintiff does not even attempt to make such a showing in his Motion.  (*Id.* at 9–10.)  He relies instead on the relevancy standard of Rule 26, which informs the question of *what* discovery should be permitted, not *whether* discovery should be permitted in the first instance.  (*Id.* at 9.)  This puts the cart before the horse and, as Defendant correctly notes, is not the appropriate standard. (Mot. 25.)

Nevertheless, Plaintiff's failure to set forth his prima facie showing in the Motion does not foreclose a finding that one has been alleged, such as in the Complaint.  Plaintiff appropriately cites *Talavera v. Sun Maid Growers of California*, No. 1:15-cv-00842-AWI-SAB, 2017 U.S. Dist. LEXIS 16509 (E.D. Cal. Feb. 6, 2017), for its finding that, at this stage of the proceedings, "the allegations in the complaint are sufficient to state a prima facie case for class relief under Rule 23."  *Id*. at *3.  In *Talavera*, a donning-and-doffing case, the defendant

objected to the plaintiff's request for pre-certification discovery on the ground that the plaintiff had not made a prima facie showing of the Rule 23(a) factors. *Id.* at *6. The court found, however, that the plaintiff was entitled to pre-certification discovery based on the Rule 23 allegations contained in the complaint. *Id.* at *6–9. Notably, Plaintiff's class allegations here are almost identical to those accepted by the court in *Talavera*. As to numerosity, the plaintiff in *Talavera* alleged that "the class is in the hundreds if not thousands," *Talavera*, 2017 U.S. Dist. LEXIS 16509, at *6–7, while Plaintiff here alleges that "the class is estimated to be greater than one hundred," (Compl. ¶ 58(q)). As to commonality, the plaintiff in *Talavera* alleged that "due to the time spent on [donning/doffing] activities, meal breaks were frequently not offered to employees within the first five hours of the commencement of their work activities and employees were not provided with a legally compliant thirty minute [meal][4] period[,]" *Talavera*, 2017 U.S. Dist. LEXIS 16509, at *7–8, while Plaintiff here alleges that "Plaintiff and class members had their meal periods interrupted and cut short by work to meet supervisor and customer demands," and that they "waited extended periods of time before taking meal periods in order to address customer demand in the retail area or respond to supervisors' questions[,]" (Compl. ¶¶ 66, 81). As to typicality, the plaintiff in *Talavera* alleged that "he and the other putative class members were not paid for

_____

[4] The *Talavera* decision states: ". . . and employees were not provided with a legally compliant thirty minute work period." *Talavera*, 2017 U.S. Dist. LEXIS 16509, at *8. A review of the complaint in the case reveals that this is a typographical error in the decision and that instead the phrase is "thirty minute meal period." Complaint at ¶ 13, *Talavera v. Sun Maid Growers of Cal.*, No. 1:15-cv-00842-AWI-SAB (E.D. Cal. June 3, 2015), ECF No. 1. *See* Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *Harris v. County of Orange*, 682 F.3d 1126, 1131–32 (9th Cir. 2012) (noting that courts may take judicial notice of undisputed matters of public record, including "documents on file in federal or state courts").

time spent donning sanitary gear and were not provided with timely meal breaks[,]" *Talavera*, 2017 U.S. Dist. LEXIS 16509, at *8, while Plaintiff here alleges that he and the putative class members "were not paid for all hours worked because all hours worked were not recorded," and "were not provided with timely, uninterrupted, thirty (30) minute meal periods and . . . were not provided with all meal periods or payment of one (1) additional hour of pay at their regular rates when they did not receive a timely, uninterrupted, thirty (30) minute meal period" (Compl. ¶¶ 27, 29).  As to underlying adequacy of representation, the plaintiff in *Talavera* alleged that "he [was] a member of the class and [did] not have any conflicts of interest with the members of the class and [would] vigorously prosecute this action[,]" *Talavera*, 2017 U.S. Dist. LEXIS 16509, at *9, while Plaintiff here, acknowledging that "he has an obligation to make known to the Court any relationship, conflicts or differences with any class member," alleges that he "is qualified to, and will, fairly and adequately protect the interests of each class member with whom he has a well-defined community of interest and typicality of claims[,]" (Compl. ¶ 58(s)).  Just as the *Talavera* court concluded that the class action allegations contained in the plaintiff's complaint were "sufficient to state a prima facie case for class relief under Rule 23" and supported a request for pre-certification discovery, *Talavera*, 2017 U.S. Dist. LEXIS 16509, at *9, so too does this Court conclude that Plaintiff has satisfied his burden to make a prima facie showing under Rule 23(a) in support of his request for pre-certification discovery.[5] *See also Coleman,* 2013 U.S. Dist. LEXIS 82815, at *16–17 (finding that the plaintiff met his *Mantolete* burden by relying, in part, on allegations in the complaint) (citing *Washington v. Joe's Crab Shack*, 271 F.R.D. 629, 636 (N.D. Cal.

---

[5] "The Court is not making findings related to class certification, but evaluates the certification factors at this time *only* for a determination of whether prima facie evidence has been shown."  *Soto v. Castlerock Farming & Transport, Inc.,* 282 F.R.D. 492, 500 n.6 (E.D. Cal. 2012) (emphasis in original).

2010) ("Plaintiff's claims, as pled, share a common question of law—whether any of the practices [defendant] is alleged to have engaged in constitute violations of California law—and at least some of the facts to be analyzed with respect to this question are the same.")).  Thus, the Court concludes that Plaintiff has satisfied his burden of establishing a prima facie showing of the Rule 23 class certification factors.

Moreover, even the absence of a such a prima facie showing would not end the inquiry.  As noted above, pre-certification discovery may be permitted where the plaintiff, alternatively, demonstrates "that discovery measures are likely to produce persuasive information substantiating the class action allegations." *Doninger*, 564 F.2d at 1313.  The Court finds that Plaintiff also has met that burden.  Plaintiff explains that the class contact information he seeks will provide access to other employees who have information that "likely [will] support Plaintiff's theories on which he will move for class certification and which will assist Plaintiff in properly defining a class and any potential subclasses."  (Mot. 9.) Plaintiff also explains that the data and documents he seeks—timekeeping data, payroll data, and wage statements—will provide facts related to commonality and typicality.  (*Id*. at 27 ("Timekeeping data . . . will establish commonality . . . and typicality"[6] and "[p]ayroll data will be used to establish commonality and typicality of Plaintiff's meal, rest, and compensation claims")); (*id.* at 29 (wage statements are ///

---

[6] Plaintiff notes that timekeeping data also will establish "preponderance."  (Mot. 27.)  However, "preponderance" is not a requirement under Rule 23.  *See Wang v. Chinese Daily News*, 737 F.3d 538, 544 (9th Cir. 2013) ("Plaintiffs need not show that every question in the case, or even a preponderance of questions, is capable of classwide resolution.  So long as there is 'even a single common question,' a would-be class can satisfy the commonality requirement of Rule 23(a)(2)." (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (alteration and internal quotation marks omitted))).

1    necessary "to establish the commonality and typicality of CWWC's failure to pay

2    all earned vested vacation wages").)

3        Relying on *Dittmar v. Costco Wholesale Corp.*, No. 14-cv-1156 LAB (JLB),

4    2016 U.S. Dist. LEXIS 172404 (S.D. Cal. Dec. 12, 2016), Defendant argues that

5    Plaintiff's explanations regarding his need for pre-certification discovery are

6    "conclusory" and "unconvincing." (Mot. 29.) But Defendant's reliance on *Dittmar*

7    is misplaced. The court in *Dittmar* did state, as Defendant contends, that "[a]bsent

8    some factual basis for a plaintiff's claims that defendant's alleged wrongs are class-

9    wide, plaintiffs are not entitled to class-wide discovery; and the plaintiff cannot rely

10   on the bare allegations of the complaint to support class-wide discovery." (*Id.*

11   (quoting *Dittmar*, 2016 U.S. Dist. LEXIS 172404, at *8).) However, *Dittmar*

12   involved only the scope of the class for which class contact information would be

13   permitted, not whether discovery should be permitted in the first instance. *See*

14   *Dittmar*, 2016 U.S. Dist. LEXIS 172404, at *10–11 (limiting the issues to only two:

15   "(1) whether discovery should be limited to particular warehouses; and (2) whether

16   discovery should be limited to particular departments within the warehouses").

17   More importantly, the court in *Dittmar* granted pre-certification discovery as to a

18   subclass even where "the moving papers [did] little to justify [the plaintiff's]

19   entitlement to the discovery," reasoning that the discovery was "likely to

20   substantiate [that subclass's] claim." *Id.* at *15. Thus, *Dittmar* more clearly stands

21   for the proposition that the "factual basis" required for pre-certification discovery is

22   met with little justification. On this record, the Court easily can conclude that

23   Plaintiff meets the *Dittmar* standard for pre-certification discovery.

24       Moreover, Defendant's objections to Plaintiff's legal authorities lack merit.

25   While Defendant is correct that the court in *Doninger* did not find abuse of

26   discretion in the lower court's denial of pre-certification discovery (Mot. 30), its

27   holding was not, as Defendant contends, based on the fact that the plaintiff had

28   failed to make a prima facie showing (*id.*); rather, it was based on the fact that

13

plaintiff had made *neither* a prima facie showing *nor* a demonstration that "discovery measures are likely to produce persuasive information substantiating the class action allegations." *Doninger*, 564 F.2d at 1313.  Similarly, while Defendant is correct that *Edwards v. The First American Corp.*, 385 F. App'x 629 (9th Cir. 2010), was not a wage-and-hour case and involved a scheme not at issue here (Mot. 30), the court's decision to grant pre-certification discovery did not turn on the nature of the case or the existence of a scheme.  *See Edwards*, 385 F. App'x at 631. Likewise, while Defendant is correct that *Talavera* was, as discussed above, a donning-and-doffing case (Mot. 30), Defendant's apparent contention that pre-certification discovery was appropriate there because donning-and-doffing cases "may be more amenable to class certification than Plaintiff's highly individualized claims" (*id*.), is wholly unsupported by the text of the decision, which at no point makes such a distinction, and which, in fact, granted pre-certification discovery on a limited justification.  *See Talavera*, 2017 U.S. Dist. LEXIS, at \*6–9.  Finally, Defendant's attempt to distinguish *Kress v. Price Waterhouse Coopers*, No. CIV S-08-0965 LKK GGH, 2011 U.S. Dist. LEXIS 87845 (E.D. Cal. Aug. 8, 2011), misses the mark.  Defendant's first distinction—that the information sought in *Kress* involved a "single specific group of employees (senior associates)" (Mot. 30)—is an inaccurate characterization of the putative class at issue given that the plaintiff in *Kress* described the group as "associate[s] or senior associate[s] in the tax line of service in California, and/or as senior associate[s] in the assurance line in California," and, as to the individuals in the tax line, "not limited to individuals who worked in the TPDG Tax line of service, but will also include the Industry Services Group, Financial Services Group, and International Tax Services group of the Tax line."  *Kress*, 2011 U.S. Dist. LEXIS 87845, at \*3, \*12.  If anything, the group for whom Plaintiff seeks information here is as, or more, specific—Day and Night Warehouse Workers.  Moreover, the second distinction advanced by Defendant—that the information involved a single entity (Mot. 30)—is of no

14

consequence because Plaintiff here also seeks information involving a single entity (Defendant).

For all of these reasons, the Court concludes that Plaintiff is entitled to pre-certification discovery.  The Court turns next to the determination of the proper scope of that discovery.

**B.    The Court Grants Plaintiff's Request That Pre-Certification Discovery Encompass Employees in Both of Defendant's Locations and Shifts, Even if They Signed Releases and/or Are Subject to Class Action Waivers.**

Having concluded that pre-certification discovery is warranted, the Court next must determine whether the specific information Plaintiff seeks is discoverable at this stage.  Necessarily implicated in that determination is the overarching question regarding the appropriate scope of that discovery—that is, how wide the discovery net may be cast.  Specifically, the Court must decide whether Plaintiff has produced sufficient justification to extend discovery beyond his particular employment circumstances such that an undue burden is not imposed on Defendant.

Plaintiff seeks to represent a putative class comprised of all of Defendant's employees who worked as a Day or Night Warehouse Worker, in both the City of Industry and the Union City locations, and regardless of whether those employees signed settlement agreements releasing Defendant from the claims asserted here and/or arbitration agreements with class action waivers, all during the period from July 22, 2015 to the present.  (Mot. 11–15.)  Plaintiff seeks this discovery although he only worked as a Day Warehouse Worker in the City of Industry, and is subject to neither a settlement agreement nor an arbitration agreement.[7]

---

[7] In their "Summary of Dispute," the Parties contend that during IDC, the undersigned "indicated that the scope of permissible discovery should initially be limited to a subgroup of 'Day Warehouse Workers employed at the CWWC, City

15

1    Defendant objects to such expansive discovery on the ground that Plaintiff

2 never worked in the Union City location or in the night shift and has not otherwise

3 produced sufficient justification entitling him to discovery as to those persons.

4 (Mot. 30–36.)  Defendant also contends that the discovery should not include

5 persons who have released their claims through settlement agreements or have

6 _____

7 of Industry location' with no distinction between Plaintiff's claims and PAGA
claims."  (Mot. 6.)  In their "Joint Statement Regarding The Procedural

8 Background," the Parties contend that the undersigned "recommended defining the
scope of discovery to include only those people employed by CWWC in the job

9 position of 'Day Warehouse Worker' at the City of Industry, California" and that
the undersigned also "advised that her recommendation was to include within the

10 scope of discovery those employees who signed Release Agreements pursuant to a
Pick-Up Stix campaign and those who had executed arbitration agreements on the

11 ground that Plaintiff needed that information based on his contention that those

12 agreements were invalid."  (Mot. 8.)  The Court disagrees with this characterization
of the dialogue during the IDC.  What is clear from the Court's record is that the

13 undersigned went out of her way to advise the Parties that she was providing

14 "preliminary thoughts" regarding "where [she] would land" given what the Parties
had proffered to the Court, both during the various informal discovery conferences

15 and the Settlement Conference.  The undersigned specifically noted that her

16 decision regarding the scope of discovery would "be informed by all sorts of
factors" for which the Court did not have all the information, and concluded that

17 briefing would assist the ultimate decision.  The undersigned also specifically noted

18 that Plaintiff's deposition would be informative, as would a review of the
Defendant's California-wide policies, information about what Plaintiff knows about

19 other locations, testimony of other employees regarding their experiences, and

20 concluded that the more information the Parties could provide, "the better,"
especially in light of the undersigned's repeated statements that she "could be

21 convinced" regarding a different scope of discovery with the proper presentation of

22 additional and competent evidence.   The Court notes that a review of the IDC
record will reveal that the undersigned did not use the term "recommend" or a

23 phrase to the effect of "should initially be limited to" in reference to the scope of

24 discovery.  Unless otherwise referred by the District Judge presiding over the case,
this Court does not have authority to make recommendations regarding—let alone

25 resolve—the scope of a class, and neither did so during the IDC nor does so in this

26 Order.  *See* 28 U.S.C. § 636(b)(1)(A) (limiting a magistrate judge's authority to
resolving and issuing orders on non-dispositive matters); Fed. R. Civ. P. 72(a); C.D.

27 Cal. Civ. R. 72-2.1.

28

16

waived their right to proceed on a class or collective basis through arbitration agreements because, having signed neither such agreement, "Plaintiff's claims are not typical of the claims of those individuals," and Plaintiff is not an adequate representative for them. (Mot. 37–40.)

The Court agrees with Plaintiff. For the reasons set forth below, the Court concludes that, based on the information provided here, discovery at this stage should include both Day and Night Warehouse Workers, who worked in either the City of Industry or Union City locations, and regardless of whether they signed releases or arbitration agreements with class action waivers.

### 1. Legal Standard

In Rule 23 class actions, a plaintiff seeking to extend his or her pre-certification discovery into locations beyond where he or she works or worked must produce some evidence that indicates company-wide violations.[8] *Nguyen v. Baxter Healthcare Corp.*, 275 F.R.D. 503, 508 (N.D. Cal. 2011). Courts interpreting this requirement make clear that the starting and ending point of this fact-intensive inquiry is whether the plaintiff is able to present evidence of a company-wide policy or practice of violating the alleged laws, and that discovery beyond this reach is unreasonably broad, unduly burdensome, and not relevant to certification of a class common to the plaintiff. *See id.; Martinet v. Spherion Atl. Enters., LLC*, ///

---

[8] The Parties dispute whether Plaintiff's PAGA claims entitle him to the discovery he seeks even if he otherwise would not be entitled to such discovery under a Rule 23 pre-certification analysis. (Mot. 15–19, 36–37.) Because the relevant period for the PAGA claims is smaller than that for the Rule 23 class action, such PAGA discovery would be subsumed within the discovery Plaintiff seeks under Rule 23. Thus, as the Court decides, for the reasons stated below, that Plaintiff is entitled to the Rule 23 pre-certification discovery he seeks, and that discovery necessarily will encompass the PAGA discovery, the Court need not resolve, and does not address, the Parties' PAGA dispute.

No. 07cv2178 W (AJB), 2008 U.S. Dist. LEXIS 48113, at *6 (S.D. Cal. June 23, 2008).

For example, in *Nguyen*, 275 F.R.D. at 504, the plaintiff, who worked in only one of the defendant's California facilities but sought to represent a class encompassing the employees in all California facilities, alleged a company-wide practice of failure to provide meal periods and accurate wage statements. Despite seeking to represent a state-wide class, the plaintiff's testimony was that she had never worked in a location other than her own, that she knew nothing about the company practices outside of her own location, that she had not spoken with any other employee about the lawsuit or obtained any information from them— including whether they agreed with the lawsuit—and that she did not know if any other employee had suffered the same wrongs as she claimed. *Id.* at 507–08. In addition, when asked, her counsel admitted that he had no evidence about other facilities, but argued that if the supervisors at plaintiff's facility did not follow company guidelines, it was "reasonable to assume that supervisors at other facilities must also have violated these same guidelines." *Id.* at 508. On these facts, the court concluded that, given the "absence of any evidence to suggest that similar violations occurred outside [the plaintiff's] facility, Plaintiff ha[d] failed to justify discovery at Defendant's other California facilities." *Id.*

Similarly, in *Franco v. Bank of America*, No. 09cv1364-LAB (BLM), 2009 U.S. Dist. LEXIS 111873, at *3 (S.D. Cal. Dec. 1, 2009), a plaintiff who worked in only two of the defendant's California branches sought to represent a class encompassing employees in all California branches, alleging a company-wide policy and practice of nonpayment of overtime wages. He supported his request for state-wide discovery through a declaration stating: (1) that he was told by the managers of both his former and current branches that the defendant could not pay overtime; (2) that he observed other putative class members at those branches being subjected to the same violations; and (3) that he knew of five other employees who

did not receive overtime payments, three of whom worked at his two branches, and two of whom held positions he did not know and worked in branches where the plaintiff had not worked. *Id.* at *7–9. In addition, the plaintiff submitted copies of two other class action complaints in California alleging similar violations. *Id*. at *9. In response, the defendant provided extensive evidence of company-wide compliance with California labor laws, including copies of its California-compliant policies, manager and employee training materials and records, and declarations from company executives testifying to its compliant practices and manager training requirements. *Id.* at *9–10. On this evidence, the court concluded that the plaintiff had not provided sufficient evidence to support a claim of company-wide violations and, as such, denied discovery regarding the approximately 27,000 California-wide employees as "overly broad and unduly burdensome," and permitted discovery only as to the 100 persons in the branches where the plaintiff worked. *Id.* at *10–12.

A similar result was obtained in *Coleman*. There, a plaintiff who worked at two of the defendant's California centers sought to represent a putative class of employees in all California centers, alleging that the defendant, "as a matter of established company policy and procedure" failed to pay its employees for all hours worked. *Coleman*, 2013 U.S. Dist. LEXIS 82815, at *4, 16. She supported her request for company-wide discovery through her own testimony, stating that "she was instructed by 'the company' or 'the boss'" to work off-the-clock and that, in compliance with those instructions, she had her staff members do the same. *Id.* at *28–29. At the same time, the plaintiff testified that "although she could not confirm whether the improper overtime and break practices occurred at every center in the country, . . . she knew 'that it happens in – especially every center [she'd] ever been to' in her market." *Id.* at *29. The court concluded that the plaintiff's testimony that the alleged improper practices occurred at all of the defendant's centers throughout the country was an assumption that was "insufficient to justify expanding discovery beyond Plaintiff's market." *Id.* On these facts, the court

denied discovery regarding employees outside of the plaintiff's market as "unduly burdensome." *Id.* at *29–30.

Likewise, in *Tracy v. Dean Witter Reynolds, Inc.*, 185 F.R.D. 303, 303–04 (D. Col. 1998), the court denied the expansion of discovery beyond the offices where the plaintiffs worked. There, the plaintiffs sought to represent a putative class of 8,000 employees at 400 nationwide offices, alleging that the defendant failed to pay overtime in violation of the Fair Labor Standards Act. *Id.* at 303–04. The court first reviewed the defendant's written policies and found that they were compliant with the FLSA and were implemented on a national plane. *Id.* at 306–08. The court next reviewed the evidence that the plaintiffs submitted—affidavits from ten employees who worked in four offices and claimed to have similar overtime pay experiences—based upon which the plaintiffs asked the court to infer a national practice to deny overtime. *Id.* at 309–11. The court noted that the plaintiffs offered no evidence of a national policy to deny overtime pay and that, although the declarations established a few examples of employees who were not paid overtime, they neither supported the contention that such "failures were due to the implementation of a national policy," nor eliminated other "variables which [could] affect the failure to receive overtime," such as the absence of pre-approval, a failure to properly record hours worked, a failure to seek pay corrections, or a supervisor's misunderstanding of the national policy. *Id.* at 311. In addition, the court concluded that, because the evidence showed nothing more than that ten employees in three offices (out of 8,000 employees in 400 offices) failed to receive overtime pay, an expansion of discovery based on this insufficient evidence would result in undue prejudice to the defendant. *Id.* at 312.

The Court notes that the legal authorities discussed above involve only the question of whether discovery should extend beyond the location where a plaintiff worked, and not whether it should extend beyond the shift that a plaintiff worked. The Parties offer no authorities addressing the shift inquiry, and the Court is aware

of none.  That said, the Court believes (and it appears that the Parties do as well) that the same basic principles apply, and will analyze the shift question under the same framework.

2.  Discussion

a.  *Plaintiff is Entitled to Pre-Certification Discovery Regarding Employees at Both the City of Industry and Union City Locations*.

In its discovery responses, Defendant objected to Plaintiff's request to expand discovery beyond the City of Industry location where he worked on the ground that such discovery is unduly burdensome, oppressive, and harassing.  (Mot. 20, 25–26.)  For the reasons set forth below, the Court overrules these objections.

There is no dispute that Plaintiff never worked at Defendant's Union City location.  (*See* Trujillo Dep. 11.)  Indeed, Plaintiff testified that he "has absolutely no knowledge of any of the wage and hour practices" at Union City in that "he **never** worked [there]" and he "confirmed that he never even spoken [sic] to any employees" at Union City.  (Mot. 30 (emphasis in original); Trujillo Dep. 11.)  Thus, to obtain California-wide discovery, Plaintiff must establish a California-wide policy or practice that violates the wage-and-hour laws at issue here.  Despite his somewhat labored argument, the Court concludes that Plaintiff has met his burden.

First, Plaintiff argues—through a series of questionable leaps in logic and without evidentiary support—that because Defendant's practices allegedly are unlawful, its policies therefore are unlawful.  He begins by noting that Defendant's records identify one person as both its Payroll Director and as the person who produced timekeeping records in this litigation.  (Mot. 11.)  From this, he jumps to the conclusion that payroll and timekeeping records for both locations are managed by the same office, from which he further concludes that there exists a company-

wide practice and policy that applies to all of Defendant's employees in all of its California locations. (*Id.*) He supports this conclusion by noting that Defendant's California Employee Handbook also makes no distinction between job positions, shifts, or facilities and was distributed company-wide regardless of location. (*Id.* at 12.) Through this, Plaintiff claims to establish that Defendant's policies are company-wide. (*Id.*)

Plaintiff next turns to establishing that those company-wide policies are unlawful. He notes that Plaintiff's records show he was not provided meal periods at the required time and was not paid for these violations; that Defendant has admitted that "no meal and rest premiums [were] paid to day warehouse workers who did not sign a release or arbitration agreement"; that "these violations were not isolated or sporadic"; that Defendant's rest break policy is *de facto* unlawful because (a) it is silent regarding whether rest periods can be taken off-premises even though its meal period policy explicitly allows employees to go off-premises, (b) Plaintiff's manager precluded him from taking rest breaks by assigning him tasks during his rest period, and (c) he was not paid for these violations. (*Id.* at 11– 12.) By combining these "facts"—lacking in evidentiary support as they may be— with his earlier conclusion that Defendant's policies are company-wide, Plaintiff claims to establish that Defendant has an unlawful company-wide policy of "disregard[ing] its obligation to pay meal and rest premiums when required." (*Id.* at 12.)

Given that the legal standard for determining whether pre-certification discovery should be permitted turns, in part, on the term "policy," and in light of Plaintiff's interchangeable use of the terms "policy" and "practice," this is an appropriate place to clarify the difference between the two. The court in *Tracy* explains this distinction with such clarity in the context of pre-certification discovery in a wage-and-hour class action that the Court adopts it here: ///

> In the context of this case, I understand the term "policy" to refer to a rule, regulation or directive which has been announced or published by [the defendant], either verbally or in writing, to its local supervisors and/or employees. I understand the term "practice" to refer to that which supervisors or employees do, that is, their actions, whether pursuant to policy or not. Thus, when plaintiffs allege that [the defendant] has both a "policy and practice" which unlawfully deprives employees of overtime compensation . . ., I understand plaintiffs to mean by the phrase "unlawful policy" that [the defendant] has published or announced to supervisors and employees through a handbook, letter, memo or other means, that employees will not be paid for any overtime hours that they work.

*Tracy*, 185 F.R.D. at 305.  In addressing the plaintiff's claim that the defendant had a "de facto policy," the *Tracy* court said:

> In the circumstances of this case, the phrase "de facto policy" either blurs the distinction between policy and practice, or attempts to blend the two, possibly because there may be facts to support one of the words, but not the other—evidence of practices, for example, but no evidence of policy.  Policy refers to that which is directed through publication, while de facto refers to that which is actually done.  If fifty people are walking in the same direction, that is the event, or de facto; if the fifty people have been told by a single source to walk in a particular direction, their common direction reflects that they are walking pursuant to the directive, or policy.  The distinction needs to be kept in mind throughout the dispute which arises from plaintiffs' motion to extend discovery, because fifty people walking in the same direction may or may not be doing so pursuant to policy or directive, depending upon the evidence which is available.

*Id.* at 306.

Returning to our analysis and applying these principles, the Court concludes that Plaintiff's reference to a *de facto* policy is actually a reference to a practice,

and that Plaintiff's conclusion about Defendant's policies is actually a conclusion about its practices.

This leaves no evidence before the Court regarding the first step in the analysis:  whether Defendant's California-wide policies are unlawful.  Surprisingly—especially in light of the Court's request to the Parties at the IDC referenced in footnote 7, *supra*—Defendant does not attach any of its California policies.  (*See generally* Mot.)  The only policy before the Court is Defendant's rest break policy, which is buried in one of Plaintiff's footnotes, and is used to support Plaintiff's argument, as detailed above, that Defendant's rest break practices create a *de facto* unlawful policy.  (*See* Mot. 12–13 n.4.)  Still, Defendant claims that its policies are "**legally compliant**," that both facilities follow applicable wage and hour law, and that counsel for Plaintiff "expressly admitted this during the [IDC] with the Court."  (Mot. 31–32 (emphasis in original), 33; Aguirre Decl. ¶ 5.)

Although it is Plaintiff's burden to establish that Defendant's policies or practices are unlawful, he neither provides evidence regarding Defendant's unlawful *policies* nor rebuts Defendant's declaration that its *policies* are lawful.  (*See generally* Mot.)  And, indeed, Defendant is correct that Plaintiff conceded during the IDC that Defendant's policies are compliant.  Even so, Plaintiff may obtain discovery regarding the Union City employees if he can convince the Court that Defendant engages in California-wide unlawful *practices*.  *See York v. Starbucks Corp.*, No. CV 08-7919-GAF (PJWx), 2011 U.S. Dist. LEXIS 155682, at *86–87 (C.D. Cal. Nov. 23, 2011) (reasoning that in light of defendant's national policy prohibiting off-the-clock work, plaintiff "must present evidence of a systematic corporate-wide practice of forcing employees to work off-the-clock to meet Rule 23's 'commonality' requirement.")

For this purpose, Plaintiff offers excerpts from his deposition testimony, the Tuttle Declaration, and the Pinkston Declaration.  In his deposition, Plaintiff clearly states that his supervisors interrupted his meal periods two or three times per week

and his rest breaks one or two times per week so that he could assist customers; that they prevented him from taking his rest breaks once a week so that he could assist customers; and that he worked off-the-clock when customers or delivery persons would arrive after he had clocked out, or to take pictures for his supervisor of packages that had not been picked up by 4:30 p.m.  (Trujillo Depo. 3–10, 13.)  But these facts establish only that *Plaintiff* suffered these violations, not that *all California employees* did.

Defendant asserts that Plaintiff's assumption—that "because he allegedly took meal breaks late or performed work after he clocked out, the same practices must have occurred at CWWC's other California facilities"[9]—is "pure speculation" and "insufficient to meet [his] burden to show that he is entitled to discovery beyond the location where he worked."  (Mot. 30–31.)  Indeed, Defendant is correct that other "courts have held *in similar cases* that limitations on location are appropriate."  (Mot. 31 (emphasis added).)  But this case is not similar to the cases that Defendant cites:  *Nguyen, Franco, Martinet, Tracy,* and *Coleman*.  Unlike in those cases, discussed in detail above, Plaintiff here offers more than mere assertions of wrongdoing in both of Defendant's locations.  He produces evidence, through the Tuttle and Pinkston Declarations, that they, as Union City employees, suffered the same alleged wage-and-hour violations as Plaintiff.

Mr. Tuttle worked as a Day Warehouse Worker in the Receiver position at the Union City facility for ten weeks, from June 4, 2017 until August 7, 2017.  (Tuttle Decl. ¶¶ 2, 9.)  He states that on average:  his meal periods commenced late five times per week and he does not recall having received a premium payment for these violations (*id.* at ¶ 5); his supervisors interrupted his meal periods two or three

---

[9] Although Defendant contends that this is Plaintiff's assumption, it offers no evidence of such, and no such assumption appears in the Motion.  (*See generally* Mot.)

times per month, requiring that he assist in unloading trucks for at least five minutes, and he does not recall receiving a premium payment for these violations (*id.* at ¶ 6); he worked shifts of more than ten hours at least once a month but did not receive a second meal period on those days, does not recall signing a meal period waiver, and does not recall receiving a premium payment for these violations (*id.* at ¶ 7); and his supervisors interrupted his rest periods two or three times per month, requiring that he unload trucks during this time, and he does not recall receiving a premium payment for these violations (*id.* at ¶ 8).  He also states that he was not paid all of his accrued but unused vacation upon his voluntary termination, and has not received that payment as of the September 4, 2020 date of his declaration.  (*Id.* at ¶ 9.)  He concludes that, based on his day-to-day observations at work,[10] other employees had similar experiences.  (*Id.* at ¶ 10.)

Mr. Pinkston[11] has worked as a Night Warehouse Worker in the Order Picker position at the Union City facility since March 2019 until the present, although he currently is out on disability.  (Pinkston Decl. ¶ 2.)  He states that on average:  he missed meal periods two times per month, and he does not recall receiving a premium payment for these violations (*id.* at ¶ 5); his meal periods commenced late

---

[10] Mr. Tuttle based this conclusion also on his "conversations with other Chefs' Warehouse employees."  (*Id.* at ¶ 10.)  However, the Court disregards this statement as impermissible hearsay for which no hearsay exception is offered.  *See* Fed. R. Evid. 801.

[11] Defendant objects to the Pinkston Declaration.  It notes that Mr. Pinkston filed a separate action on behalf of himself and other Night Warehouse Workers at the Union City facility, and argues that this constitutes a concession that the Union City facility and night shift employees "should be treated separate and apart from this action." (Mot. 33.)  The Court disagrees.  To begin with, Defendant offers no legal authority for this proposition, and the Court is aware of none.  Moreover, even if this were a concession of anything—and the Court does not opine either way—it would be a concession by Mr. Pinkston because he filed the other action, not by Plaintiff who has nothing to do with that filing.

four or five times per week, and he does not recall receiving a premium payment for these violations (*id.* at ¶ 6); his supervisor interrupted his meal periods on a few occasions, instructing him to complete assigned tasks, and he does not recall receiving a premium payment for these violations (*id.* at ¶ 7); he worked shifts of more than ten hours at least once a week but did not receive a second meal period on those days, does not recall signing a meal period waiver, and does not recall receiving a premium payment for these violations (*id.* at ¶ 8); he missed rest breaks one to three times per week, and does not recall receiving a premium payment for these violations (*id.* at ¶ 9); his rest period began late one or two times per week, and he does not recall receiving a premium payment for these violations (*id.* at ¶ 10); his rest periods were interrupted two to four times per week with work, and he does not recall receiving a premium payment for these violations (*id.* at ¶ 11); he never left the premises during his rest breaks, and he never saw any other employee at Union City leave the facility during a rest break (*id.* at ¶ 12).  He concludes that, based on his day-to-day observations at work,[12] other employees had similar experiences.  (*Id.* at ¶ 13.)

While the Court recognizes, as Defendant aptly points out, that the declarations of Messrs. Tuttle and Pinkston suffer from a certain (perhaps intentional) vagueness regarding possible defenses for Defendant—that although they took late meal periods, they were not required to do so by Defendant and Defendant did not fail to provide meal periods (Mot. 33); that although they did not take second meal periods, Defendant did not fail to provide second meal periods (*id.* at 34)—the Court concludes that their allegations of violations alone are

---

[12] As did Mr. Tuttle, Mr. Pinkston based this conclusion also on his "conversations with other Chefs' Warehouse employees."  (*Id.* at ¶ 10.)  However, as with the Tuttle Declaration, the Court disregards this statement as impermissible hearsay for which no hearsay exception is offered.  *See* Fed. R. Evid. 801.

sufficient to open the door to discovery in Union City, even if Defendant ultimately can prove defenses to those allegations.

Defendant contends that:  the City of Industry and Union City facilities have separate management teams who set shift modules and break schedules; that each facility has unique practices suited to its operations; that the City of Industry facility is much larger than the Union City facility in terms of volume and call orders, and that, as a result, City of Industry employs more personnel; and that the Union City sales people more often pick up will call orders and deliver them to customers rather than the customers picking up the orders themselves.  (Mot. 33–34; Aguirre Decl. ¶¶ 5–6.  While all of this may be true, the probative value of this testimony, and whether and how it controverts the Tuttle and Pinkston Declarations, is not evident to the Court.

Based on the foregoing, the Court **OVERRULES** Defendant's objections, and concludes that Plaintiff is entitled to discovery that encompasses both the City of Industry and the Union City facilities.

        b.      *Plaintiff is Entitled to Pre-Certification Discovery Regarding Employees in Both the Day Shift and the Night Shift.*

In its discovery responses, Defendant objected to Plaintiff's request to expand discovery beyond the day shift in which he worked on the ground that such discovery is unduly burdensome, oppressive, and harassing.  (Mot. 20, 25–26.)  For the reasons set forth below, the Court overrules these objections.

There is no dispute that Plaintiff never worked during the night shift.  (Trujillo Dep. 12.)  Regardless, Plaintiff contends that this makes no difference because the Day Warehouse Worker position is the same as the Night Warehouse Worker position.  (Mot. 13–15.)  He points to a Warehouse Worker job description (that was not provided to the Court) and notes that it makes no distinction between

28

the day shift and the night shift.  (*Id.* at 14–15.)[13]  In addition, Plaintiff contends that the Tuttle and Pinkston Declarations support his contention that Warehouse Workers from the day and night shifts performed the same duties as those found in the job description under which Plaintiff worked.  (*Id.*)  For example, Mr. Pinkston declares that he, as a Night Warehouse Worker, performed the following functions found in Plaintiff's job description:  reads customer order to determine items to be moved, gathered, or distributed; conveys materials and items from receiv[ing] areas to storage or to other designated areas; sorts and places materials or items on racks, shelves, or in bins accord[ing] to predetermined sequence or bar code; sorts perishable goods in refrigerated rooms; assembles customer orders from stock and places orders on pallets; sweeps and cleans warehouse areas; ensures outbound shipments are accurate and free of damage; and repairs pallets when necessary. (*Compare* Mot. 15 *with* Pinkston Decl. ¶ 4.)  Moreover, Mr. Tuttle, as a Day Warehouse Worker, also performed functions that Mr. Pinkston, as a Night Warehouse Worker, performed:  conveys materials and items from receiving areas to storage or to other designated areas; sorts perishable goods in refrigerated rooms; sweeps and cleans warehouse area; sorts, scans, and prepares shipments, ensures that the exact number of products is loaded and shipped; moves and stages product and materials using a hand pallet or other equipment; and operates all equipment in a safe and efficient manner following prescribed work methods.  (*Compare* Tuttle Decl. ¶ 4 *with* Pinkston Decl. ¶ 4.)

Defendant, on the other hand, contends that Plaintiff's assertion that there is only one job description for both shifts "is moot" because Defendant has produced

---

[13] Plaintiff contends that his deposition testimony demonstrates that discovery should not be limited to employees in the Day Shift because he testified regarding the tasks he performed and his knowledge of the tasks assigned and performed by other Day Warehouse Workers.  (Mot. 14.)  However, neither the Motion nor the Trujillo Deposition contains evidence of this testimony.  (*See generally* Mot.; *see generally* Trujillo Dep.)  Accordingly, the Court disregards this argument.

29

a job description for each of the day and night shifts.  (Mot. 35.)  Defendant did not provide these job descriptions to the Court (*see generally* Mot.), but nevertheless contends that the duties of the Day Warehouse Workers differ from those of the Night Warehouse Workers (Mot. 34–35; Aguirre Decl. ¶ 7).  As Defendant explains:  Night Warehouse Workers do not have any interactions with either third party logistics companies, such as FedEx or UPS, or customers; Day Warehouse Workers are assigned different duties depending on experience, preference, and company need, such as order selecting; only one Day Warehouse Worker is assigned to Will Call on a long-term basis, being the only person who interacts with customers or logistics companies, and this job generally does not change; and, Will Call at the City of Industry closes at noon so that all workers can take their thirty-minute break without interruption, and then closes altogether at 1:00 p.m. or 2:00 p.m.  (Mot. 34–35; Aguirre Decl. ¶¶ 7–12.)  As with the discussion about the two locations, while all of this may be true, these distinctions do not effectively rebut Plaintiff's contentions that the Day and Night Warehouse Workers generally perform the same job.

Based on the foregoing, the Court **OVERRULES** Defendant's objections, and concludes that Plaintiff is entitled to discovery that encompasses both the day and night shifts.

c.     *Plaintiff is Entitled to Pre-Certification Discovery Regarding Employees Who Signed Settlement Agreements*.

In its discovery responses, Defendant objected to Plaintiff's request for discovery regarding employees who signed settlement agreements that released the claims alleged here (Mot. 20, 25–26), on the theory, as explained during multiple informal discovery conferences, that, because they released their claims, they

///

30

cannot be part of the putative class.  For the reasons set forth below, the Court overrules this objection.

The Parties' dispute with respect to the discoverability of information regarding persons who signed settlement agreements centers on Defendant's settlement campaign, which apparently was instituted after this lawsuit was filed.[14] According to Defendant, it made offers to the putative class members to settle the claims raised in this class action pursuant to *Chindarah v. Pick Up Stix*, 171 Cal. App. 4th 796 (2009) ("*Pick Up Stix*").[15]  (Mot. 39.)  The agreement entered into by Defendant with some, as yet unidentified, portion of the class provides the following release:

> [B]y signing this agreement, you confirm that the Company provided you with all meal and rest periods in accordance with their written policy, reimbursed all of your business expenses (including cell phone and mileage expenses), paid you all wages that you earned (including overtime and vacation), timely paid you all earned wages upon your termination, provided you with accurate wage statements/payroll records, and maintained

---

[14] Other than an excerpt from the agreement, the Motion is devoid of any information regarding the Defendant's settlement campaign.  (*See generally* Mot.)  However, the Court details here the information provided by the Parties during the IDC.

[15] *Pick Up Stix* is a California case holding that a defendant, sued in a class action for wage-and-hour violations, may settle the claims with the individual putative class members before class certification.  *Pick Up Stix,* 171 Cal. App. 4th at 803.  The process through which a defendant attempts to settle the claims individually with each of the putative class members has become widely known as a "*Pick Up Stix* campaign," and the resulting settlement, as referenced by Defendant, a "*Pick Up Stix* settlement."  (*See* Mot. 39.)  Employee advocates often challenge *Pick Up Stix* campaigns to invalidate the releases.  *See, e.g., Marino v. CACafe, Inc.*, No. 16-cv-6291 YGR, 2017 U.S. Dist. LEXIS 64947, at *5–7 (N.D. Cal. Apr. 28, 2017) (invalidating releases based upon a finding that the defendant's pre-certification communications with the putative class members were misleading and omitted material information).

1
2

accurate payroll records.  You also confirm that you are
not an aggrieved employee under PAGA.

3

(*Id.*)

4          Defendant contends that any putative class member who entered into this

5   agreement has released all claims against Defendant and, by confirming that he or

6   she is not an "aggrieved employee" under PAGA, is precluded from pursuing

7   PAGA penalties through this representative action.  (*Id.* at 37–39.)  Defendant then

8   concludes that Plaintiff should be entitled to discovery regarding only those persons

9   who possibly could be in the putative class—that is, according to Defendant, those

10  who did not release their claims.  (*Id.*)

11          The obvious implication from this dispute is that the size of the putative class

12  is of grave consequence to the Parties.  If the putative class is too small, Plaintiff

13  may not be able to establish the numerosity requirement of Rule 23, which could be

14  the death knell to the class action.  And, even if the class is certified, the smaller the

15  certified class, the smaller the recovery in the case.  In an apparent effort to

16  maximize the size of the class, Plaintiff advances two legal theories, both of which

17  implicate the relevancy of the discovery he seeks and the ultimate decision

18  regarding the scope of discovery to which he is entitled.

19          First, as stated during the IDC but not in the Motion, Plaintiff argues that

20  Defendant's *Pick Up Stix* campaign is procedurally improper, and therefore any

21  releases resulting from that campaign are unenforceable.  At the IDC, Defendant

22  acknowledged Plaintiff's intent to challenge its *Pick Up Stix* campaign.  The result

23  of Plaintiff's theory, if proven, could be that the putative class is not reduced by

24  those who signed these releases, and instead remains fully intact (whatever that size

25  might be).  In this case, the scope of discovery would encompass, subject to other

26  considerations, the entire class.

27          Alternatively, Plaintiff argues, both at the IDC and here, that even if the *Pick

28  Up Stix* campaign was not procedurally improper—meaning that the releases would

be found enforceable—the release of PAGA penalty claims is unenforceable because PAGA claims cannot be released pursuant to the California Supreme Court's recent decision in *Kim v. Reins Int'l California, Inc.*, 9 Cal. 5th 73 (2020) ("*Reins*"). (Mot. 17–19.)  The result of this theory could be that the putative class would be reduced, but only by the number of persons who fall outside of the PAGA period (however many persons that might be).  Under this theory, the scope of discovery could encompass a smaller putative class than under the first theory, but either way, contrary to Defendant's argument, Plaintiff would be entitled to discovery regarding some or all of the putative class.

For reasons unknown to the Court, despite the many hours discussing this issue during multiple informal discovery conferences, the Parties focus their argument in the Motion solely on the question of whether an employee may, after *Reins*, release his or her PAGA penalty claims through a settlement campaign. (Mot. 17–19; 37–39.)  But this ignores the more fundamental question—whether the settlement agreement is enforceable in the first instance.  If it is not, whether an employee can release his or her PAGA penalty claim is of no consequence.  Given the amount of time the Parties and the Court have discussed this issue without formal resolution, the Court recognizes that ignoring it altogether could result in a further, downstream discovery dispute that eventually would require further briefing and a further Order.  Accordingly, in the interest of securing the just, speedy, and inexpensive determination of the action (*see* Fed. R. Civ. P. 1), the Court will address this argument.

As a starting point, the Court does not here decide the enforceability of Defendant's *Pick Up Stix* agreements.  Nor does the Court opine on whether *Pick Up Stix* is the proper standard for evaluating a federal defendant's pre-certification communication with putative class members and the enforceability of any resulting agreements.  Both are issues for class certification that will be decided by the presiding District Judge.  For now, the Court addresses only whether discovery

33

1  should be permitted as to the persons who entered into these settlement agreements
2  and thereby purportedly released the claims raised here.

3      Plaintiff's argument, as stated during the Court's informal discovery
4  conferences, is that he should be entitled to access the putative class members who
5  signed settlement agreements in order to develop his theory that Defendant's *Pick
6  Up Stix* campaign was improper.  Defendant contends that Plaintiff does not need
7  access to the putative class members for this purpose because he can argue against
8  the enforceability of the agreements based solely on the language of the agreement,
9  an exemplar of which Defendant has produced to Plaintiff.  (Mot. 39.)  Here, the
10  Court disagrees with Defendant.

11      It is correct that, in some circumstances, the language of the agreement itself
12  can provide the basis of invalidity.  *See, e.g.*, *Camp v. Alexander*, 300 F.R.D. 617,
13  625–26 (N.D. Cal. 2014) (invalidating opt-outs where the employer's letter to the
14  putative class members described the lawsuit's potential negative effect on the
15  business if the employees participated); *County of Santa Clara v. Astra USA, Inc.*,
16  No. C 05-03740 WHA, 2010 U.S. Dist. LEXIS 78312, at *15–22 (N.D. Cal. July 8,
17  2010) (invalidating pre-certification releases where the employer's letter did not
18  provide sufficient details about the case); *Burford v. Cargill*, No. 05-0283, 2007
19  U.S. Dist. LEXIS 1679, at *5–6 (W.D. La. Jan. 9, 2007) (finding misleading a
20  communication to putative class members that did not advise of the pending
21  putative class action and ordering it jointly re-written).

22      However, the circumstances surrounding how the releases were obtained can
23  provide another, independent basis of invalidity.  *See, e.g., Guifi Li v. A Perfect Day
24  Franchise, Inc.*, 270 F.R.D. 509, 517–19 (N.D. Cal. 2010) (invalidating opt-outs
25  obtained during a mandatory meeting with employees that was deemed coercive);
26  *Wang v. Chinese Daily News*, 236 F.R.D. 485, 488–89 (C.D. Cal. 2006), *rev'd on
27  other grounds*, 709 F.3d 829 (9th Cir. 2012) (deeming inherently coercive the one-
28  on-one, mandatory workplace meetings through which opt-outs were obtained and

invalidating the opt-outs).  Thus, even though Defendant has produced an exemplar of the settlement agreement to Plaintiff, he still is entitled to have access to the persons who entered into these agreements in order to explore this potential aspect of invalidity.

Based on the foregoing, the Court **OVERRULES** Defendant's objection, and concludes that Plaintiff is entitled to discovery regarding employees who signed settlement agreements.

> d.    *Plaintiff Is Entitled to Pre-Certification Discovery Regarding Employees Who Signed Arbitration Agreements with Class Action Waivers*.

In its discovery responses, Defendant objected to Plaintiff's request for discovery regarding employees who signed arbitration agreements with class action waivers (Mot. 20, 25–26) on the theory, as explained during the various informal discovery conferences, that, because they are precluded from proceeding on a class or collective basis, they cannot be part of the putative class.  In the Motion, Defendant argues that "[t]he scope of discovery should exclude those putative class members who signed such agreements because Plaintiff's claims are not typical of the claims of those individuals, and Plaintiff is not an adequate representative of those individuals."  (*Id.* at 40.)  For the reasons set forth below, the Court overrules Defendant's objections to this discovery.

Although Defendant asserts that it has produced an exemplar of the arbitration agreement at issue (*see* Mot. 40), Defendant has failed to provide this exemplar to the Court (*see generally* Mot.).  Thus, in an effort to add clarity to this discussion, the Court notes that a class action waiver contained in such an agreement generally is an agreement by the employee to proceed with any claims via individualized arbitration proceedings, rather than on a class, collective or representative basis, as the agreement may provide.  *See Azeveda v. Comcast Cable*

35

*Communs. LLC*, No. 5:19-cv-01225-EJD, 2019 U.S. Dist. LEXIS 177765, at *19–20 (N.D. Cal. Oct. 11, 2019) (enforcing class action waiver and holding that, thereunder, plaintiff had waived his right to bring a class action).  Here, Defendant notes that its arbitration agreement contains an opt-out provision.  (Mot. 40.)  The Court notes that such a provision generally gives the employee an opportunity to take affirmative steps to opt-out of the arbitration agreement without suffering adverse consequence of forfeiting his or her right to a court or jury.  *See, e.g., Vigueras v. Red Robin Int'l*, SACV 17-01422 JVS (DFMx), 2019 U.S. Dist. LEXIS 54432, at *6, 11–12 (C.D. Cal. Feb. 21, 2019) (holding that opt-out provision in plaintiff's arbitration agreement prevented a finding that the agreement was procedurally unconscionable).

Defendant is correct that Plaintiff fails to address the class action waiver issue in the Motion.  (Mot. at 40.)  Still, Defendant acknowledges that Plaintiff intends to challenge the enforceability of the arbitration agreement that contains that class action waiver.  (*Id.*)  As the Court did with the settlement agreement discussion, the Court will address this issue to avoid future discovery disputes.  *See* Fed. R. Civ. P. 1.

The Court recognizes that the weight of authority supports Defendant's argument that Plaintiff, who apparently is not subject to an arbitration agreement with a class action waiver, could be found to not be an adequate representative of individuals who are so bound, and that his claims could be found to not be typical of the claims of those individuals.  *See Avilez v. Pinkerton Gov't Servs., Inc.*, 596 F. App'x 579, 579 (9th Cir. 2015) (holding that the district court abused its discretion by certifying classes and subclasses that included employees who had signed class action waivers, on the ground that the named plaintiff was not an adequate representative of these individuals because she had not signed such a waiver); *see also Tschudy v. J.C. Penny Corp.*, No. 11-cv-1011 JM (KSC), 2015 U.S. Dist. LEXIS 165897, at *11–12 (S.D. Cal. Dec. 9, 2015) (holding that named plaintiffs

36

1  failed to satisfy typicality and adequacy requirements of Rule 23(a) where the

2  putative class members were subject to arbitration provisions while the named

3  plaintiff was not); *Quinlan v. Macy's Corp. Servs.*, No CV1200737DDPJCX, 2013

4  U.S. Dist. LEXIS 164724, at *7–9 (C.D. Cal. Aug. 22, 2013) (finding that the

5  named plaintiff could not satisfy Rule 23's typicality requirement in part because

6  95% of the putative class of 84,000 was subject to an arbitration agreement while

7  he was not).  But these decisions concern class certification—not pre-certification

8  discovery—and Defendant provides no legal authority limiting pre-certification

9  discovery regarding putative class members who are subject to a class action

10  waiver.

11       To the contrary, recent cases by district courts in this Circuit have held

12  otherwise.  In *Adamov v. Pricewaterhouse Coopers LLP*, No. 2:13-cv-01222-TLN-

13  AC, 2017 U.S. Dist. LEXIS 211210, at *8 (E.D. Cal. June 5, 2019), the plaintiff

14  sought class contact information for all putative class members, including those

15  who were subject to arbitration agreements.  The court rejected the defendant's

16  argument that the plaintiff lacked standing to challenge an arbitration agreement to

17  which he was not subject, and allowed class-wide discovery.  *Id.* at *8–11.  The

18  court reasoned:

19          Defendant's own argument best presents the conundrum:
20          "The validity/enforceability of [Defendant's] arbitration
            program cannot be adjudicated until after class
21          certification proceedings, and only if the class includes
            individuals who are bound by arbitration agreements."
22          Defendant is correct that the issue of whether individuals
            are bound by the arbitration agreement can be part of the
23          class only arises if the class actually includes potentially
            bound members.  The issue here is whether plaintiff is
24          entitled to discovery that may lead to such individuals
            actually being included in the class.  To prevent this
25          discovery would amount to a premature decision on the
26          issue of the arbitration agreement's applicability, by

27

28

> limiting plaintiff's ability to include potentially-bound individuals in the class.

*Id.* at \*10–11 (citations omitted).  The court also found that the plaintiff was entitled to discovery surrounding the agreement because the parties disputed the validity of the agreement.  *Id.* at \*8.  The court explained that:

> whether or not the arbitration program is proper and/or effective[] are matters properly brought before the district judge in this case.  The court reminds the parties that this is a discovery dispute, and the ultimate issue of the arbitration agreement is not before the undersigned.

*Id.* at \*9.

Similarly, the plaintiff in *Sansone v. Charter Communications, Inc.*, No. 17-cv-01880-WQH-JLB, 2019 U.S. Dist. LEXIS 19452, at \*22–23 (S.D. Cal. Feb. 6, 2019), also sought class contact information for the putative class members, including those who had executed an arbitration agreement applicable to the claims brought in the action.  The court allowed this discovery, reasoning that "[b]y communicating with putative class members, Plaintiffs will be able to gather information related to the enforceability of the arbitration agreement, which may be at issue during the certification stage."  *Id.* at \*25 (citing *Adamov*, 2017 U.S. Dist. LEXIS, at \*4).

Defendant argues, without citing legal authority, that, because it provided to Plaintiff an exemplar of its arbitration agreement, he has what he needs to challenge the agreement, and further discovery should be denied.  (Mot. 40.)  However, this is inconsistent with the above legal authorities.  Based upon those authorities, the Court concludes that giving Plaintiff access to the employees who entered into the arbitration agreements will allow Plaintiff an opportunity to explore the facts regarding the agreement's validity.

///

///

38

Based on the foregoing, the Court **OVERRULES** Defendant's objection, and concludes that Plaintiff is entitled to discovery regarding employees who are subject to arbitration agreements with class action waivers.

* * *

On the basis of the above discussion, the Court concludes that Plaintiff is entitled to pre-certification discovery, as detailed below, regarding all of Defendant's employees who work or worked as Warehouse Workers, at either or both of Defendant's City of Industry and Union City locations, in either or both day or night shifts, regardless of whether they signed settlement agreements releasing Defendant from the claims asserted here or signed arbitration agreements with class action waivers, for the period from July 22, 2015 to the present.  As shorthand going forward in this Order, the Court will refer to this group of persons as the "Relevant Employees."

The Court now turns to the determination of whether Plaintiff is entitled to the specific discovery he seeks as to the Relevant Employees.

## C.    The Court Grants Plaintiff's Request to Compel Defendant's Supplemental Responses to Interrogatory No. 1 Regarding the Relevant Employees.

Plaintiff seeks an order compelling Defendant to supplement its response to Interrogatory No. 1, which asks Defendant to:

> Set forth the full name, employment position(s), last known home address, and last known telephone numbers, including but not limited to, home telephone numbers and cellular telephone numbers of each and every COVERED EMPLOYEE who was employed by DEFENDANT during the RELEVANT TIME PERIOD.

///

(Mot. 20.)  Plaintiff advises the Court that, pursuant to a compromise reached by the Parties, he will be propounding a revised version of this interrogatory that will retain the same language add but a request for employment dates.  (*Id.* at 20 n.14.) For the reasons set forth below, the Court **GRANTS** this request.

### 1.   Legal Standard

Rule 26(b)(1) governs the scope of discovery in federal cases.  It states:

> Unless otherwise limited by court order, the scope of discovery is as follows:  Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.  Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1).  Rule 401 of the Federal Rules of Evidence provides that evidence is relevant if:  "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.

In addition to relevance, Rule 26(b)(1) requires that the discovery be proportional to the needs of the case.  Fed. R. Civ. 26(b)(1).  Proportionality is determined by a consideration of the following factors:  "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  *Id.*  "Information within this scope of discovery need not be admissible in evidence to be discoverable."  *Id.*

40

Once the propounding party establishes that its discovery requests satisfies the relevance test of Rule 26(b)(1), the party resisting the discovery "has the burden to show discovery should not be allowed, and has the burden of clarifying, explaining, and supporting its objections." *Superior Commc'ns v. Earhugger, Inc.*, 257 F.R.D. 215, 217 (C.D. Cal. 2009); *see also Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975) (requiring defendants "to carry a heavy burden of showing why discovery was denied.").

The court "must limit the frequency or extent of discovery" pursuant to Rule 26(b)(2)(C) if:

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1).

Fed. R. Civ. P. 26(b)(2)(C).

District courts have broad discretion to manage discovery. *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003). Discovery rulings of a district court "will not be overturned in the absence of a clear abuse of discretion." *U.S. Fid. & Guar. Co. v. Lee Invs. L.L.C.*, 641 F.3d 1126, 1136 (9th Cir. 2011) (internal quotation marks and citation omitted). A court may, pursuant to this discretion, craft discovery orders that may expand, limit, or differ from the relief requested. *Crawford-El v. Britton*, 523 U.S. 574, 598–99 (1988); *see also UMG Recordings, Inc. v. Doe*, No. 08-1038 SBA, 2008 U.S. Dist. LEXIS 92788, at *9 (N.D. Cal. July 30, 2008) ("In fashioning discovery orders under Rule 26(d), the district courts wield broad discretion, as they do when managing any aspect of discovery.")

In addition to the general discoverability standards, it long has been the rule that, in class actions, "before class certification has taken place, all parties are

41

entitled to equal access to persons who potentially have an interest in or relevant

knowledge of the subject of the action, but who are not yet parties." *Wiegele v.*

*FedEx Ground Package Sys.*, No. 06cv1330-JM-POR, 2007 U.S. Dist. LEXIS

9444, at *6 (S.D. Cal. Feb. 8, 2007) (citation and quotation omitted).  Indeed,

discovery of the contact information of putative class members routinely is allowed.

*See, e.g., Salgado v. Land O'Lakes*, No. 1:13cv0798-LJO-SMS, 2014 U.S. Dist.

LEXIS 175158, at *28–30 (E.D. Cal. Dec. 18, 2014) (collecting cases showing that

"[c]ourts in this circuit have made it clear that precertification disclosure of class

members' contact information, such as names, addresses, telephone numbers, and

email addresses, is routine practice in wage and hour class action litigation cases

governed by Rule 23"); *Artis*, 276 F.R.D. at 352 ("The disclosure of names,

addresses, and telephone numbers is a common practice in the class action

context.") (citing *Currie-White v. Blockbuster, Inc.*, No. C 09-2593-MMCMEJ,

2010 U.S. Dist. LEXIS 47071, at *7 (N.D. Cal. Apr. 15, 2010)); *Putnam v. Eli Lilly*

*& Co.*, 508 F. Supp. 2d 812, 814 (C.D. Cal. 2007) (holding that contact with class

members is useful to determine commonality and typicality under Rule 23);

*Kaminske*, 2010 U.S. Dist. LEXIS 141514, at *14 (noting that contact information

for the putative class is relevant to "test Plaintiff's theories regarding the

commonality of Defendant's practices."); *Ho v. Ernst & Young, LLP*, No. C05-

04867 JF (HRL), 2007 U.S. Dist. LEXIS 37700, at *5–6 (N.D. Cal. May 9, 2007)

("contact information is relevant to *both* the merits and class certification")

(emphasis in original); *Sanbrook v. Office Depot,* No. C 07-5938 RMW (PVT),

2009 U.S. Dist. LEXIS 30852, at *2 (N.D. Cal. Mar. 30, 2009) (permitting

discovery of class contact information because such persons could serve as

percipient witnesses); *Jimenez v. Domino's Pizza*, *LLC*, No. SACV 04-1107-JVS

(RCx), 2006 U.S. Dist. LEXIS 66510, at *8 (C.D. Cal. Jan. 13, 2006) (granting

discovery of class contact information as necessary to pursue certification of the

class action); *York v. Starbucks Corp.*, No. CV 08-7919-GAF (PJWx), 2009 U.S.

Dist. LEXIS 92274, at \*3–4 (C.D. Cal. Jun. 30, 2009) (granting discovery of class contact information so that the plaintiff could pursue her claims and ultimately those of other employees); *see also Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101–02 (1981) (holding that, even prior to class certification, counsel in Rule 23 class actions must be allowed to communicate with potential class members in order to, among other things, gather information).

To obtain class contact information, a plaintiff need only show that access to putative class members "would aid in confirming [his or her] theories of liability and further developing evidence in support of class certification." *Sansone*, 2019 U.S. Dist. LEXIS 19452, at \*17; *see also Kaminske*, 2010 U.S. Dist. LEXIS 141514, at \*14 (finding that class contact information  is "relevant to aid in the identification and collection of . . . potentially common evidence, as well as to test . . . theories regarding the commonality of [a defendant's] practices" and "sufficient to establish that the requested discovery is likely to produce persuasive information substantiating the class action allegations").

> 2.    Plaintiff Satisfies His Burden of Establishing That His Request for Class Contact Information Satisfies the Rule 26(b)(1) Relevancy Test.

Here, Plaintiff requests class contact information because "[contact with prospective class members] could lead to the discovery of admissible evidence relevant to the class certification issue."[16]  (Mot. 17 (alteration in original) (quoting

---

[16] The Court notes that, through the 2015 amendments to Rule 26(b), the rule no longer defines relevancy as information "reasonably likely to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26 advisory committee's notes for 2015 amendment.  The test for relevancy after the 2015 amendment is whether evidence is "relevant to any party's claim or defense."  Fed. R. Civ. P. 26(b). Notwithstanding Plaintiff's use of the prior Rule 26(b) standard, the Court finds that Plaintiff satisfies his obligation to establish relevancy in that, as he asserts,

*Babbitt v. Albertson's Inc.*, No. C-92-1883-SBAPJH, 1992 U.S. Dist. LEXIS 19091, at *16–17 (N.D. Cal. Nov. 30, 1992).)  Indeed, as the legal authorities amply support, Plaintiff is entitled to access to the putative class members so that he may obtain the information he needs to substantiate his class allegations or rebut Defendant's opposition to class certification.  *See Wiegele*, 2007 U.S. Dist. LEXIS 9444, at *13 n.1 ("[T]he identified employees are likely percipient witnesses to Plaintiff's wage and hour claims").

> 3.  <u>Defendant Does Not Meet Its Burden of Establishing That the Discovery of Class Contact Information Should Be Prohibited under Rule 26(b)(2).</u>

Finding that Plaintiff has met his burden of establishing the relevancy of the class contact information he seeks, the Court now turns to a determination whether Defendant has met its burden to show that the discovery must be prohibited and to clarify, explain, and support its objections.  *Superior Commc'ns v. Earhugger*, 257 F.R.D. 215, 217 (C.D. Cal. 2009); *Bryant v. Ochoa,* No. 07cv200 JM PCL, 2009 U.S. Dist. LEXIS 42339, at *3 (S.D. Cal. May 14, 2009).

In its response to Interrogatory No. 1, Defendant objected to the discovery of class contact information on multiple grounds, only two of which are asserted in this Motion:  (1) this discovery constitutes merits discovery that should be "deferred until it is certain that the case will be allowed to proceed as a class action" (Mot. 36–38); and (2) this discovery invades a protectable privacy interest in this information (*id.* at 38–39).  For the reasons stated below, the Court overrules both objections.

///

---

class contact information is relevant to his "class certification issue"—a claim he must prove.

a.     *Defendant's "Merits Discovery" Objection Is Overruled.*

Defendant's contention that the discovery of class contact information should be deferred until after the court has certified a class is not supported by its authorities. *In re Rail Freight Fuel Surcharge Antitrust Litigation*, 258 F.R.D. 167, 168 (D. D.C. 2009), is not on point. There, the only question before the court was "whether bifurcated discovery [was] appropriate." The defendants advocated for bifurcated discovery, arguing, among other things, that the court should decide whether to certify the class as quickly as possible because this would reduce costs in the long-run as the parties would be assured of the scope of the class, and that Defendant could effectively isolate the evidence necessary for class certification. *Id.* at 169–70. The plaintiffs argued against bifurcation, claiming, among other things, that class and merits discovery are indistinguishable and that bifurcated discovery would cause inefficiencies, disputes, and delays, thereby "bel[ying] the principles of judicial economy." *Id.* at 170–72 (citations omitted). Contrary to Defendant's assertion, the court never held that merits discovery should be deferred until after a class is certified. (*See* Mot. 40.) Instead, in denying the defendant's request for bifurcation, the court crafted a compromise plan that allowed both pre-certification and merits discovery to proceed in tandem, but limited the duration of the pre-certification discovery period such that the merits discovery obtained during that period would be "no greater than it has to be." *In re Rail*, 258 F.R.D. at 176. Nowhere did the court in *In re Rail* discuss class contact information, let alone contemplate that its discovery should be deferred until after class certification. *See generally id.*

*Micro Motion, Inc. v. Kane Steel Co.*, 894 F.2d 1318 (Fed. Cir. 1990), also does not help Defendant. Micro Motion sought non-party sales and product information claiming it was relevant to the issue of lost profits damages in its patent infringement case against Kane Steel, noting that Micro Motion might have to prove that the non-party's products were themselves infringements or unacceptable

1   non-infringing substitutes. *Id.* at 1321. The only issue before the court was the

2   relevancy of that information to Micro Motion's damages. *See id.* at 1326–27. The

3   court did note, as Defendant contends, that "the discovery rules are designed to

4   assist a party to prove a claim it reasonably believes to be viable without discovery,

5   not to find out if it has any basis for a claim." (Mot. 40 (quoting *Micro Motion*, 894

6   F.2d at 1327 (emphasis omitted)).) But the court's holding that the discovery was

7   not relevant was premised on its finding that Micro Motion's claim was based

8   solely on unfounded suspicion, and that it was "trolling" for new claims. *Micro*

9   *Motion*, 894 F.2d at 1327. This is probative of nothing here, where, instead,

10  Plaintiff has established that (1) his wage-and-hour claims are not premised on

11  unfounded suspicion, but rather, at the very least, on his own experiences; and (2)

12  the class contact information is not sought to develop new claims, but rather, to

13  support already existing claims. (*See* Mot. 11–15; *see generally* Compl.) Indeed,

14  Defendant ignores the reasoning of the *Micro Motion* court that is more on point

15  here: "Clearly[,] discovery is allowed to flesh out a pattern of facts already known

16  to a party relating to an issue necessarily in the case." *Id.* at 1326. Thus, if

17  anything, *Micro Motion* supports Plaintiff's argument that class contact information

18  is discoverable.

19      In addition, Defendant's authorities noting that courts in this Circuit have

20  denied class contact information at the pre-certification stage are inapposite. (*See*

21  Mot. at 41.) In *Hatch v. Reliance Insurance Co.*, 758 F.2d 409, 415–16 (9th Cir.

22  1985), the Ninth Circuit did, as Defendant contends, uphold the district court's

23  decision to deny the plaintiff's attempt to obtain the names of similarly-situated

24  investors, but it did so because the district court first had denied class certification

25  based on the incompetency of counsel, and because, in requesting this information

26  from a third party, the plaintiff improperly used a Rule 34 document request. In

27  *Palmer v. Stassinos*, No. 5:04-cv-3026 RMW (RS), at *9–13, 2005 U.S. Dist.

28  LEXIS 41270 (N.D. Cal. May 18, 2005), the district court did, as Defendant

contends, deny the disclosure of class contact information, but it did so because the plaintiff already had been provided information that would inform the Rule 23 factors of numerosity and typicality.  In *Mandrigues v. World Savings, Inc.*, No. C 07-4497 JF (RS), 2008 U.S. Dist. LEXIS 134780, at \*6–7 (N.D. Cal. June 20, 2008), the district court did, as Defendant contends, deny the disclosure of class contact information at the pre-certification stage, but it did so because, as in the *Palmer* case, "it [did] not appear that the identities of class members [were] required to enable plaintiffs to file a motion for class certification."  In *Krzesniak v. Cendant Corp.*, No. C 05-5156 MEJ, 2007 WL 756905, at \*1 (N.D. Cal. Mar. 8, 2007), the district court did, as Defendant contends, deny pre-certification class contact information, but it did so stating that "good cause [might] exist to permit the requested discovery were Plaintiff and his counsel unable to locate and interview any putative class members," and noting that the plaintiff testified that he already had spoken to six of the seventy-six putative class members.  Thus, none of these cases support Defendant's argument that class contact information should be denied merely because it is requested at the pre-certification stage.  (Mot. 41.)  To the contrary, they support Plaintiff's request for class contact information:  class certification has not been denied as in *Hatch*; Plaintiff has not been provided other information that could inform the Rule 23 factors as in *Palmer* and *Mandrigues*; and there is no evidence that Plaintiff already has spoken to almost 8% (6/76) of the putative class members.

On this basis, Defendant's "merits discovery" objection is **OVERRULED**.

### b.    *Defendant's Privacy Objection Is Overruled.*

Defendant's argument that the discovery of class contact information invades a protectable privacy interest (Mot. 42–43) is not tenable under current law.

In diversity actions, state law governs questions involving a privacy privilege.  *Goro v. Flowers Foods, Inc.*, 334 F.R.D. 275, 287 n.12 (S.D. Cal. 2018);

*see generally* Fed. R. Evid. 501.  In California, that privilege is founded in Article I, section I of the California Constitution.  Cal. Const., art. I, § 1; *see also Goro*, 334 F.R.D. at 286–87.  But this right of privacy is not absolute.  *See Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 37 (1994).  The framework for assessing privacy claims, as set forth by the California Supreme Court, is as follows.  First, "the claimant must possess a 'legally protected privacy interest,' such as "'an interest in precluding the dissemination or misuse of sensitive and confidential information.'"  *Pioneer Elecs. (USA), Inc. v. Superior Ct.*, 40 Cal. 4th 360, 370 (2007) (quoting *Hill*, 7 Cal. 4th at 35).  Second, the claimant must have "a reasonable expectation of privacy under the particular circumstances," founded on "broadly based and widely accepted community norms."  *Id.* at 370–71 (quoting *Hill*, 40 Cal. 4th at 37).  Third, the invasion of privacy must be "serious."  *Id.* at 371 (quoting *Hill*, 40 Cal. 4th at 37).   Fourth, the privacy interest must outweigh the countervailing interests, such as discovery rights.  *See id.*

In *Belaire-West Landscape, Inc. v. Superior Court*, 149 Cal. App. 4th 554 (2007), the court held that, in the wage-and-hour class action context, employees have a legally protected privacy interest, but could "reasonably be expected to want their information disclosed to a class action plaintiff who may ultimately uncover for them unpaid wages that they are owed."  *Id.* at 561.  The court also held that these privacy interests are sufficiently protected by providing the putative class members with a notice requiring that they opt out if they do not want their contact information disclosed to a class action plaintiff.  *Id.* at 561–62.

Ten years later, the California Supreme Court affirmed the *Belaire-West* decision in *Williams v. Superior Court*, 3 Cal. 5th 531, 553–35 (2017), and held that a *Belaire-West* notice was sufficient to protect the privacy interests of putative class members and aggrieved employees under PAGA.  The court stated:

> In wage and hour collective actions, fellow employees
> would not be expected to want to conceal their contact

> information from plaintiffs asserting employment law
> violations, the state policies in favor of effective
> enforcement of these laws weigh on the side of
> disclosure, and any residual privacy concerns can be
> protected by issuing so-called Belaire-West notices
> affording notice and an opportunity to opt out from
> disclosure.

*Id.* at 553.

After balancing the privacy interests at issue against the "fundamental public policy underlying California's employment laws" and the "general public interest in facilitating the ascertainment of truth in connection with legal proceedings and in obtaining just results in litigation," the courts have concluded that an opt-out system such as that enunciated in *Belaire-West* permits the disclosure of not only the names of putative class members, but also their addresses and telephone numbers. *Puerto v. Superior Court*, 158 Cal. App. 4th 1242, 1256 (2008) (internal quotation marks and citation omitted). In *Alch v. Superior Court*, 165 Cal. App. 4th 1412, 1432–34 (2008), the court added to the list of permissible disclosures, among many other categories, work history information, including the identity of specific employers, job titles, periods of employment, credits, and awards.

Some federal courts in this circuit have adopted the *Belaire-West* opt-out notice procedure for employment class actions. *See, e.g., Nguyen*, 275 F.R.D. at 512; *Arredondo v. Sw. & Pac. Specialty Fin., Inc.*, No. 1:18-cv-01737-DAD-SKO, 2019 U.S. Dist. LEXIS 200750, at *11–12 (E.D. Cal. Nov. 18, 2019); *Aldapa v. Fowler Packing Co.*, 310 F.R.D. 583, 588 (E.D. Cal. 2015); *Murphy v. Target Corp.*, No. 09cv1436-AJB (WMc), 2011 U.S. Dist. LEXIS 62458, at *12 (S.D. Cal. June 14, 2011).

On the other hand, some federal courts have declined to do so, finding that a protective order, in lieu of a *Belaire-West* notice, sufficiently protects the privacy interest of putative class members and aggrieved employees in the confidentiality of their contact information. *See, e.g., Goro,* 334 F.R.D. at 287–88; *see also Austin v.*

*Foodliner, Inc.*, 16-cv-07185-HSG (DMR), 2018 U.S. Dist. LEXIS 36685, at *4–5 (N.D. Cal. Mar. 6, 2018) (finding that the predominant practice is to allow pre-certification discovery of putative class members' contact information subject to a protective order, without requiring a *Belaire-West* notice).  The court in *Austin* noted that courts "generally have required *Belaire-West* notices only when there are special privacy concerns, such as the disclosure of medical or financial information, and/or when the parties have agreed to such notice."  *Austin*, 2018 U.S. Dist. LEXIS 36685, at *5.

The cases on which Defendant relies to resist the discovery of class contact information are not on point.  (*See* Mot. 42.)  In *Davies v. Superior Court*, 43 F. Supp. 2d 1102, 1108–14 (1999), the requested information did not involve addresses and telephone numbers of putative class members—as is at issue here—but rather voluminous tax return information and general business records, all of which were subject to privileges not attendant here, including tax, trade secret, and financial privacy privileges.  In *United States Department of Defense v. Federal Labor Relations Authority*, 510 U.S. 487, 492–502 (1994), the Supreme Court balanced the competing interests of the Privacy Act of 1974, the Freedom of Information Act, and the right of a union to obtain home addresses for agency employees in the bargaining unit represented by the union—none of which are at issue here—and concluded that the Privacy Act forbids disclosure of employee addresses to their collective bargaining representatives.  In *Rowan v. United States Post Office Department*, 397 U.S. 728, 737–40 (1970), the Supreme Court decided the constitutionality of Title III of the Postal Revenue Act and Federal Salary Act of 1967—also not at issue here—and held that a homeowner was within his or her constitutional right to require that a mailer of pandering advertisements remove his or her name from its mailing lists and stop all future mailings.  In *Planned Parenthood Golden Gate v. Superior Court*, 83 Cal. App. 4th 347, 361–70 (2000), the privacy intrusion was vastly more serious than here, in that there existed the

possibility of violence against, and harassment of, the abortion clinic staff—a risk
not attendant in wage-and-hour class actions.  In *Britt v. Superior Court*, 20 Cal. 3d
844, 848, 859 (1978), the privacy intrusion also was more serious than here, as it
involved "extensive and intimate details of both [plaintiffs] own and others'
activities in various local political associations"—none of which are requested here.

On this basis, Defendant's privacy objection is **OVERRULED**.

* * *

Based on the foregoing, the Court concludes that Plaintiff is entitled to the
contact information for the Relevant Employees.  The Court next turns to whether
Defendant's disclosure of that information is to be made pursuant to a *Belaire-West*
notice or the existing Protective Order.  (*See* Prot. Order, ECF No. 33.)

Neither party seems to take a strong position on this issue other than
regarding which party should bear the cost.  Plaintiff states that "it matters not . . .
whether the production of contact information is obtained through either a *Belaire-
West* notice or pursuant to the Parties' already filed and signed Stipulated Protective
Order" provided, based on *Williams*, that the Parties "split the cost associated with
the dissemination of the notice, as is common practice in both class action and
PAGA enforcement litigation."  (Mot. 22–23, & n.16 (citing *Williams*, 3 Cal. 5th at
555).)  Defendant asks simply, but without citing legal authority, that "Plaintiff be
required to provide a *Belaire-West* notice and pay all related costs."  (Mot. 42–43.)

On June 26, 2020, the Parties submitted for the Court's consideration a
Stipulated Protective Order (ECF No. 32), which has been in effect since the Court
issued it as proposed on June 30, 2020 (Prot. Order).  The "Good Cause Statement"
of the Protective Order identifies the following information as protected from any
use other than for the purpose of "prosecuting, defending or attempting to settle this
Action":

///

51

> This action is likely to involve trade secrets, customer and pricing lists and other valuable research, development, commercial, financial, technical and/or proprietary information for which special protection from public disclosure and from use other than prosecution of this action is warranted.  Such confidential and proprietary materials and information consist of, among other things, confidential business or financial information, information regarding confidential business practices, or other confidential research, development, or commercial information (*including information implicating privacy rights of third parties*), information otherwise generally unavailable to the public, or which may be privileged or otherwise protected from disclosure under state or federal statutes, court rules, case decisions, or common law.

(*Id*. at 3, (emphasis added).)

The Protective Order not only limits the use of the information, but also governs its storage and maintenance, how it must be disclosed, to whom it may be disclosed, how it must be protected in case of court-ordered disclosure, the remedy for its unauthorized disclosure, the procedures for its recovery upon an inadvertent disclosure, the protective measures that must be taken when the information needs to be filed, and its final disposition.  (*Id*. at 9–15.)  Based on this agreed-upon level of protection for "information implicating privacy rights of third parties," the Court concludes that this Protective Order sufficiently protects the privacy interests of the putative class members.  (*See id*. at 3.)

Nevertheless, the Court acknowledges that a *Belaire-West* notice adds another layer of protection, giving Defendant's employees—who are not, at this time, parties to the action—the right to decide whether their contact information should be disclosed at all, even if robustly protected by the Protective Order. Moreover, the Court is influenced by Plaintiff's cooperative posture and his willingness to yield the decision to Defendant subject to an appropriate cost allocation.  (Mot. 22–23 ("it matters not to Plaintiff" except that "if [Defendant]

insists that a *Belaire-West* notice be sent out," then the costs should be split between the Parties).)  That said, the Court does not believe that a sharing of costs is appropriate here for two reasons.  *First*, the Court has found that the Protective Order—which Defendant itself negotiated—is sufficient to protect the privacy interests at stake.  *Second*, the privacy intrusion at issue does not rise to the level of that found by the courts in *Davies*, *Federal Labor Relations Authority*, *Rowan*, *Planned Parenthood*, and *Britt*, *supra*, to require additional protection.  Accordingly, the Court makes its Order on an alternative basis, as follows:

Option 1:  Defendant shall respond to Interrogatory No. 1, as amended by agreement of the Parties (Mot. 20 n.14), by providing contact information for the Relevant Employees, pursuant to the Protective Order, within seven (7) days after the date of this Order.

Option 2:  If, however, Defendant believes that the Protective Order does not afford the level of protection it desires for the contact information of its employees, Defendant may elect to make disclosure of this information pursuant to a *Belaire-West* notice, through an agreed-upon third-party administrator, using agreed-upon language, to be sent no later than fifteen (15) days after the date of this Order, with a return period of no more than twenty-one (21) days from its mailing, and for which Defendant shall bear the entirety of the cost.  Under this option, Defendant shall respond to Interrogatory No. 1, as amended by agreement of the Parties (Mot. 20 n.14), by providing the contact information for the Relevant Employees, who do not timely exercise their *Belaire-West* opportunity to opt out, within ten (10) days after the close of the *Belaire-West* period.  To avail itself of this option, Defendant must notify Plaintiff of its election to proceed thereunder, in writing, no later than two (2) days after the date of this Order.  The intent of this timeline is to ensure that the *Belaire-West* notice is not overlooked by its recipients in the mix of holiday mail, and to ensure that the discovery cut-off date set by the District Judge remains achievable.

**D.    The Court Grants Plaintiff's Request to Compel Defendant's Supplemental Responses to Requests Nos. 5, 6, and 30, and Production of a Representative Sample of This Information Regarding the Relevant Employees.**

Plaintiff seeks an order compelling Defendant to supplement its responses to Requests Nos. 5, 6, and 30, and to produce a representative sample of this information. (Mot. 6, 9, 23–24.)  Request No. 5 seeks timekeeping data, Request No. 6 seeks payroll data, and Request No. 30 seeks wage statements. (*Id.* at 23–24.)  Without waiving any rights to do so at a later time, Plaintiff's requests do not, at this time, seek the identity of the employees whose data is produced. (*Id.*)  Rather, Plaintiff seeks anonymized data with sufficient information, such as employee identification numbers, to allow him to correlate the clock-in and -out times in the timekeeping data with the corresponding payroll data and wage statements. (*Id.*)

For the reasons set forth below, the Court finds that Plaintiff is entitled to this information.

1.    <u>Plaintiff Satisfies His Burden of Establishing that his Request for Timekeeping Data, Payroll Data, and Wage Statements Satisfies the Rule 26(b)(1) Relevancy Test.</u>

Plaintiff seeks a representative sample of timekeeping and payroll data, as well as related wage statements regarding the Relevant Employees. (Mot. 6, 9, 23–24.)  He contends that both timekeeping and payroll data are essential to his evaluation and preparation of his motion for class certification because it will assist him in establishing commonality and typicality. (*Id.* at 27.)  He explains that his experts will use the timekeeping data to establish the number and frequency of compensation violations related to his wage-and-hour claims across the class. (*Id.*)  He further explains that the wage statements will allow him to determine

compliance with the California wage statement rules in Labor Code section 226 and specifically to demonstrate whether employees properly were paid all vested vacation hours upon termination.  (*Id.* at 28.)  There is no question that, with this, Plaintiff satisfies his burden of establishing the relevancy of this information.

Indeed, many courts in this Circuit have found this data to be relevant in wage-and-hour class actions such as this, and granted pre-certification discovery based on similar contentions.  *See, e.g., Arredondo*, 2019 U.S. Dist. LEXIS 200750, at *18–20 (compelling the production of timekeeping, payroll, and wage statement information as relevant to class certification); *Romo v. GMRI, Inc.*, No. EDCV-12-0715-JLQ, 2013 U.S. Dist. LEXIS 192481, at *16–17 (C.D. Cal. Jan. 25, 2013) (compelling the production of a 20% random sample of wage statements, payroll records, and time sheets); *Hill v. Eddie Bauer*, 242 F.R.D. 556, 563 (C.D. Cal. 2007) (compelling the production of documents pertaining to putative class members' hours, wages, business-related expenses, repayment of wages, termination wages, meal breaks and rest breaks so that plaintiff could pursue class certification and prosecute the action); *Ho v. Ernst & Young, LLP*, No. C-05-04867 JF (HRL), 2007 U.S. Dist. LEXIS 37700, at *3–4 (N.D. Cal. May 9, 2007) (compelling the production of time and activity records because they could "indicate whether the putative class members did work that was sufficiently similar to justify a class action.").

2.   <u>Defendant Does Not Meet Its Burden of Establishing That the Discovery of Timekeeping Data, Payroll Data, and Wage Statements Should Be Prohibited Under Rule 26(b)(2).</u>

As with the class contact information analysis, having found that Plaintiff has met his burden of establishing the relevancy of the information he seeks, the Court now turns to a determination of whether Defendant has met its burden to show that the discovery must be prohibited and to clarify, explain, and support its objections.

Defendant argues that the timekeeping and payroll data sought through Requests Nos. 5 and 6 is not proportional to the needs of the case because it will not reflect information related to Plaintiff's off-the-clock claim which, by definition, cannot be contained in any records. (Mot. 43.)  But this argument either misses the mark altogether or is devoid of any evidentiary support.  Plaintiff's Complaint clearly alleges more than off-the-clock claims. (*See generally* Compl.)  Yes, his overtime claim, minimum wage claim, meal period claim, wage statement claim, and termination wages claim could be, in part or in whole, premised on the alleged off-the-clock work.  But to the extent Plaintiff is alleging these claims on a standalone basis, this data is not only relevant, but necessary.  Moreover, Plaintiff's Complaint also alleges claims for untimely and interrupted meal periods and rest breaks, as well as unpaid vacation hours, none of which appear to be derivative of off-the-clock work and all of which can be informed by this data. (*See* Compl. ¶¶ 66, 73, 81—89, 96–98, 102.)  Alternatively, to the extent Defendant contends that Plaintiff's claims have evolved over time and through discovery, it provides no evidence of this here. (*See generally* Mot.)

Defendant further argues that the wage statements sought through Request No. 30 also are not proportional to the needs of the case because Defendant has produced Plaintiff's wage statements and any violation of the wage statement rules should be apparent from them. (Mot. 43.)  Again, this misses the mark.  Even if Plaintiff's wage statements were to contain all of the violations that could possibly exist related to Plaintiff's wage statement claim, this still deprives Plaintiff of the opportunity to obtain information regarding the wage statements of other putative class members, which he needs to certify a class.  This is the very circularity of reasoning that is prohibited by *Doninger, Mantolete,* and *Vinole*, *supra*.  Indeed, given Defendant's argument here—that Plaintiff's purported lack of knowledge regarding his counterparts in Union City and the night shift should bar him from obtaining discovery about those employees—it is doubtful that Defendant would

leave unchallenged any argument for class certification premised on Plaintiff's experiences alone.

\* \* \*

Based on the foregoing, the Court concludes that Plaintiff is entitled to the timekeeping data, payroll data, and wage statements for the Relevant Employees. The Court next turns to the question whether Plaintiff is entitled, at this pre-certification stage, to the data regarding every member of the putative class or only a representative sample of the class. In addition, the Court addresses the form of production.

> 3. Defendant Shall Produce the Timekeeping and Payroll Data, as Well as the Wage Statements, for a 50% Representative Sample of the Relevant Employees and the Last and Second-to-Last Wage Statements for All Former Relevant Employees.

The Parties agree that, at least at this stage of the proceedings, this information need only be produced for a representative sample of the Relevant Employees. (Mot. 6, 9, 43–44.) However, neither party has presented any fact or argument regarding the sampling method that may be appropriate, or the size of the class. (*See generally id*.) Instead, Plaintiff simply notes that he would be agreeable to a representative sample, without suggesting a sample size. (*Id*. at 6, 9.) Defendant, on the other hand, contends that a sample size of 10% would be appropriate, but offers no justification in support of this contention. (*Id*. at 43–44.)

Defendant points to two cases in support of its contention that a ten-percent sample would be appropriate. (*Id*. at 43.) However, the Court is not persuaded that these cases, and other cases of which the Court is aware, can be of assistance, even at an informational level, because they are based, at least in part, on class size—information Defendant has not provided here. For example, in *Talavera*, 2017 U.S.

Dist. LEXIS 16509, at *7, 12, the court ordered a 10% sample based on a putative class size of 5,309.  In *Brum v. MarketSource, Inc.*, No. 2:17-cv-241-JAM-EFB, 2018 U.S. Dist. LEXIS 137568, at *11–16 (E.D. Cal. Aug. 14, 2018), the court ordered a 10% sample of wage statements and a 30% sample of electronic time and payroll records based on a putative class size of 7,400.  Cases beyond those provided by Defendant also are of minimal assistance.  In *Romo*, 2013 U.S. Dist. LEXIS 192481, at 12, *16–17, the court ordered a 20% sample based on a putative class size of 21,000.  In *Quintana v. Claire's Boutiques, Inc.*, No. 5:13-cv-00358-PSG, 2014 U.S. Dist. LEXIS 7973, at *2, 8–9 (N.D. Cal. Jan. 21, 2014), the court ordered a 20% sample based on a putative class of 1,100.  In *Heredia v. Sunrise Senior Living LLC*, No. 8:18-cv-01974-JLS (JDEx), 2019 U.S. Dist. LEXIS 226747, at *11, 20–21, the court ordered a 15% sample based on a putative class of 13,000.  In *Kaminske*, 2010 U.S. Dist. LEXIS 141514, at *3, 16, the court ordered a 10% sample based on a putative class of 1,700.

In contrast, courts faced with smaller putative classes tend to compel pre-certification discovery for the entire putative class rather than for a representative sample.  For example, in *Faraji v. Target Corp.*, No. ED CV 17-155-ODW (SPx), 2017 U.S. Dist. LEXIS 228574, at *17–18 (C.D. Cal. Apr. 28, 2017), the court found that a 10% sample for a class of 826 persons was too narrow and instead ordered production as to the entire class.  Similarly, in *Arredondo*, 2019 U.S. Dist. LEXIS 200750, at *11–12, the court ordered production as to the entire class, finding the putative class of 1,133 to be "relatively small," and surveying cases that "routinely order samples that outnumber the size of [its] putative class."  In *Urena v. Central California Almond Growers Ass'n*, No. 1:18-cv-00157-LJO-EPG, 2019 U.S. Dist. LEXIS 95546, at *18 (E.D. Cal. June 6, 2019), the court declined to order a sample for the "relatively small" putative class of 286 employees, and instead ordered production as to the entire class.

///

1    The Court notes that, at the IDC, Defendant represented that there were thirty
2  Day Warehouse Workers in the City of Industry during the relevant class period,
3  and that this count included those who signed *Pick Up Stix* releases and/or were
4  subject to class action waivers.  Defendant also represented that the addition of the
5  Night Warehouse Workers would increase that count by more than 100, but
6  declined to provide a more definitive count.  Thus, in the City of Industry alone, the
7  Relevant Employees exceed a count of 130 by some unknown number.  The Court
8  has no information regarding the extent to which the Relevant Employee count
9  would increase upon the addition of the same group of employees for the Union
10  City facility.  Thus, it is impossible from these facts to determine if the Relevant
11  Employee count here is closer to that of the putative classes considered "relatively
12  small," or otherwise.  However, because Plaintiff requests this data for a
13  representative sample, the Court will follow the Hawaiian proverb and not disturb
14  the waters that are tranquil.

15    With this in mind, the Court determines—with guidance from the legal
16  authorities above—that a sample size of 50% is a good starting point.  If, for any
17  reason, this sample proves inadequate—because of the inability to locate former
18  employees, the reluctance of current employees to speak to Plaintiff's counsel, or
19  any other reason—or if Plaintiff learns that Defendant intends to challenge his class
20  certification bid on the ground that the sample is not adequately representative,
21  Plaintiff may apply for additional relief.  Whatever the nature of the sampling, the
22  production of the timekeeping data, payroll data, and wage statements must be
23  coordinated so that Plaintiff may correlate the timekeeping data with its payroll and
24  wage statement counterparts—that is, the 50% sample shall be for the same persons
25  across timekeeping, payroll, and wage statement information.

26    During the IDC, Plaintiff clarified that, even if the Court were to compel the
27  production of only a representative sample of the requested data, he still would
28  need the second-to-last and last wage statements for every former employee in the

putative class in order to establish the commonality and typicality of his vacation claim.  It is unclear whether Plaintiff has abandoned this request in the Motion. (*Compare* Mot. 6 ("Plaintiff contends the scope of permissible discovery should include a representative sample taken from all [of the putative class]") *and id*. at 9 ("Accordingly, Plaintiff requires access to all Warehouse Workers at both facilities and, for purposes of class certification, a representative sample of their relevant timekeeping, payroll and wage statements"), *with id*. 29 ("Plaintiff requires the second-to-last and last wage statement of each former Covered Employee in order to establish the commonality and typicality of [Defendant's] failure to pay all earned vested vacation wages.").)  Noting the unique needs presented by a vacation claim that seeks to establish a failure to pay all accrued-but-unused vacation hours upon the conclusion of employment, which information, in turn, is detailed on the wage statements, and being mindful of the possibly that the size of such a sub-set of the Relevant Employees could render a 50% representative sample inadequate, the Court determines that Plaintiff is entitled to the second-to-last and last wage statements for all former Relevant Employees.

In addition, the Court notes that Plaintiff has agreed to receive this data, at least for now, anonymized—that is, without the names of the employees, but with sufficient identifying information, such as, for example, an employee identification number—so that the data can be correlated across itself.  (*See* Mot. 23–24.) Defendant does not address this issue.  (*See generally id*.)  The Court agrees with Plaintiff.  Defendant must provide this data anonymized but with some form of identification information.

///

///

///

///

///

4.   Defendant Shall Produce the Timekeeping and Payroll Data in Excel-Friendly Format or Other Searchable Database or Native Format.

Requests Nos. 5 and 6 ask that the timekeeping and payroll data be provided in an Excel-readable and searchable database, or another electronic searchable database or native format, and note that a production of this data in searchable PDF is not an acceptable format.  (Mot. 23–24.)  In the Motion, Plaintiff explains that his "experts require a Microsoft Excel-friendly document to accurately and effectively assess the violations without incurring overwhelming litigation costs," which Plaintiff notes could mean "thousands [of dollars] in costs and fees" due to the necessity to "hire companies and commit time from support staff to review thousands of documents and input the relevant information into Microsoft Excel-friendly files."  (*Id.* at 28.)  Defendant fails to address this issue altogether.  *(See generally id.*)

In their Joint Rule 26(f) Report, the Parties advised the Court of their intentions regarding the production of electronically stored information ("ESI").  Plaintiff wrote:  "Defendants have disclosed that they currently have limited ESI, excluding timesheet information.  Plaintiff will seek future ESI as appropriate.  If it is determined that additional ESI exists, Plaintiff will meet and confer to establish any appropriate ESI protocols."  (ECF No. 14, at 10.)  Defendant wrote:  "Defendant does not anticipate any ESI-related discovery issues."  (*Id.* at 11.)

In its written responses to Requests Nos. 5 and 6, Defendant objects only as to the source of the information sought, stating:  "Defendant further objects on the ground that the Request is unduly burdensome and oppressive, including to the extent that it exceeds the permissible scope of discovery by seeking electronically stored information from a source that is not accessible because of undue burden or expense.  (Mot. 24–25.)  As to Request No. 5, Defendant further states that, subject to its objections, it "will produce its time records *for Plaintiff* during the relevant

time." (*Id.* at 25 (emphasis added).)  As to Request No. 6, Defendant further states that, subject to its objections, it "will produce its wage statements/payroll records to the extent they are in Excel or an otherwise searchable format *for Plaintiff*."  (*Id.* at 25–26 (emphasis added).)

The Court notes that Defendant did not interpose an objection regarding the form of production, as Rule 34 permits.  Fed. R. Civ. P. 34(b)(2)(D) ("The response may state an objection to a requested form for producing electronically stored information.  If the responding party objects to a requested form—or if no form was specified in the request—the party must state the form or forms it intends to use.")  Although Rule 34 does not contain a provision that untimely objections are waived, *see generally* Fed. R. Civ. P. 34, the Ninth Circuit has stated that a failure to object in a timely manner to discovery requests propounded under Rule 34 results in the waiver of any objection.  *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1473 (9th Cir. 1992) ("It is well established that a failure to object to discovery within the time required constitutes a waiver of any objection.").

The Court does not know what to make of Defendant's silence, both in light of its Rule 26 obligations and its opportunity to object to the form of production as requested in Requests Nos. 5 and 6.  As Defendant fails to address this issue altogether in the Motion, it is unclear whether Defendant disputes its obligation to produce the documents/data as requested.

Accordingly, the Court **GRANTS** Defendant's request for an order compelling Defendant to produce its responses to Requests Nos. 5 and 6 in an Excel-readable and searchable database, or another electronic searchable database or native format.

///

///

///

///

## IV.   CONCLUSION

For the reasons set forth above, the Motion is **GRANTED** and, thereupon, the Court **ORDERS** as follows:

1.   Plaintiff is entitled to pre-certification discovery, as detailed below.

2.   The pre-certification discovery shall be regarding the Relevant Employees, which, as defined above, encompasses the following persons:  all current and former Day and Night Warehouse Workers in both the City of Industry and Union City locations, including those persons who signed settlement agreements releasing the claims raised here and/or arbitration agreements with class action waivers, for the period from July 22, 2015 to the present.

3.   Defendant is **ORDERED** to supplement its written response to Interrogatory No. 1, as amended by agreement of the Parties (Mot. 20 n.14), to include the full names, employment positions(s), last known home address, last known telephone numbers—including but not limited to, home telephone numbers and cellular telephone numbers— and employment dates, for the Relevant Employees, pursuant to either Option 1 or Option 2:

   a.   Option 1:  subject to the existing Protective Order, **within seven (7) days after the date of this Order**, or

   b.   Option 2:  subject to Defendant's election to proceed under a *Belaire-West* notice, through an agreed-upon third-party administrator, using agreed-upon language, to be sent **no later than fifteen (15) days after the date of this Order**, with a return period of no more than twenty-one (21) days from its mailing, and for which Defendant shall bear the entirety of the cost.  To avail itself of this option, Defendant must notify Plaintiff of its election to proceed thereunder, in writing, **no**

**later than two (2) days after the date of this Order**.  If Defendant elects to proceed under this option, it is **ORDERED** to respond to Interrogatory No. 1, as amended by agreement of the Parties (Mot. 20 n.14), by providing, **within ten (10) days after the close of the *Belaire-West* period**, the contact information for the Relevant Employees who do not timely exercise their *Belaire-West* opportunity to opt out.

4.   Defendant is **ORDERED** to supplement its written responses to Requests Nos. 5 and 6, and produce, **within fifteen (15) days after the date of this Order**, the timekeeping data and payroll data for a 50% sample of the Relevant Employees, in an Excel-readable and searchable database, or another electronic searchable database or native format.  Although the data shall be anonymized, it must provide some form of identification information, such as, for example, an employee identification number, so that Plaintiff may be able to correlate the data across itself.

5.   Defendant is **ORDERED** to supplement its written response to Request No. 30, and produce, **within fifteen (15) days after the date of this Order**, the wage statements for a 50% sample of the Relevant Employees.  In addition, Defendant is **ORDERED** to produce the last and second-to-last wage statements for all, rather than a 50% sample of, former Relevant Employees.  Although the data shall be anonymized, it must provide some form of identification information, such as, for example, an employee identification number, so that the data can be correlated across itself.

6.   The Parties are **ORDERED** to meet and confer **forthwith** regarding the sampling method to be employed in responding to Requests Nos. 5, 6, and 30, as well as how the data shall be anonymized.  If the Parties

are unable to agree regarding the sampling method and/or the data anonymization method, each shall file, **within seven (7) days after the date of this Order**, a proposed order regarding the sampling method and/or data anonymization method.

7.    Whatever the sampling method, the production of the timekeeping data, payroll data, and wage statements, must be coordinated so that the data can be correlated across itself—that is, the 50% sample shall be for the same persons across timekeeping, payroll, and wage statement data.

8.    In that the Court **GRANTS** the entirety of Plaintiff's Motion, he may apply for the reasonable expenses incurred in making the Motion, including attorneys' fees, pursuant to Rule 37(a)(5).  Upon the filing of such motion, the Court will set a briefing schedule and a hearing date. The Court reminds Plaintiff that such motion must be accompanied by sufficient evidence to support the monetary relief sought.  *See Gates v. Deukmejian*, 987 F.2d 1392 (9th Cir. 1993); *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973 (9th Cir. 2008); *Jordan v. Multonah County*, 815 F.2d 1258 (9th Cir. 1987); *Van Gerwen v. Guarantee Mut. Life Co.*, 214 F.3d 1041 (9th Cir. 2000).

It is so ordered.

DATED:  October 19, 2020

_____
MARIA A. AUDERO
UNITED STATES MAGISTRATE JUDGE